CIVIL ACTION NO.  05-1547 (Sullivan, J.)
Bankruptcy Case Number 02-0359 (Chapter 11)

_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

**IN RE CAPITOL HILL GROUP, DEBTOR.**

**ADVERSARY PROCEEDING:**

**NEWMARK OF WASHINGTON, D.C. LLC, D/B/A NEWMARK & BANK COMPANY,**
**Appellant,**

**v.**

**CAPITOL HILL GROUP,**
**Appellee**

_____

**ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA
(The Honorable S. Martin Teel, Jr., United States Bankruptcy Judge)**

_____

**BRIEF OF APPELLANT**

_____

**Christopher B. Mead
London & Mead
1225 19th St., N.W., Suite 320
Washington, D.C. 20036
(202) 331-3334**

**Attorneys for Appellant Newmark of
Washington, D.C. LLC, d/b/a Newmark
& Bank Company**

## TABLE OF CONTENTS

**PAGE(S)**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

APPLICABLE STANDARD OF APPELLATE REVIEW . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     I.   D.C. CODE 42-1705 DOES NOT APPLY
          TO NEWMARK'S SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     II.  THERE ARE SUFFICIENT WRITINGS TO SATISFY
          THE PUBLIC POLICY PURPOSE BEHIND SECTION 42-1705. . . . . . 15

     III.  CHG'S UNAMBIGUOUS PROMISES IN THE
          PURCHASE AND SALE AGREEMENTS
          TO PAY NEWMARK "PURSUANT TO . . . SEPARATE
          WRITTEN AGREEMENT[S]" ENTITLED NEWMARK
          TO JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     IV.  CHG IS ESTOPPED FROM RELYING ON 42-1705. . . . . . . . . . . . . . . 18

     V.  THE PREVENTION DOCTRINE PRECLUDES CHG
         FROM TAKING ADVANTAGE OF ITS OWN BREACH
         OR REJECTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE OF SERVICE (by electronic filing) . . . . . . . . . . . . . . . . . . . . . . . . 21

ADDENDUM 1 (Newmark's bankruptcy claim, with attached
Superior Court Complaint and relevant excerpts from sales contracts
signed by Capitol Hill Group)

ADDENDUM 2 (January 10, 2005 Opinion and Order
of the bankruptcy court)

ADDENDUM 3 (May 26, 2005 Order
of the bankruptcy court)

ADDENDUM 4 (Declaration of Laurence Bank)

ADDENDUM 5 (Excerpts from the Deposition of Peter Shin, 1/16/02)

ADDENDUM 6 (March 27, 2000 fax to Dr. Shin with attached
letter dated March 27, 2000 from Laurence Bank)

ADDENDUM 7 (September 29, 2000 letter from Laurence Bank
to Dr. Peter Shin)

## **TABLE OF AUTHORITIES**

**CASES**                                                                 **PAGE(S)**

*A.S. Johnson Co. v. Atlantic Masonry Co.*, 693 A.2d 1117 (D.C. 1997) . . . . . . . . . . . . 17

*Aronoff v. Lenkin Co.*, 618 A.2d 669, 682-83 (D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . 20

*Clay v. Hanson*, 536 A.2d 1097 (D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Deutsch v. Barsky*, 795 A.2d 669 (D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Finlay Commercial Real Estate, Inc. v. Paino*, 133 N.H. 4, 573 A.2d 125 (1990) . . . . . 17

*Fred Ezra Co. v. Pedas*, 682 A.2d 173 (D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hackney v. Morelite Constr.*, 418 A.2d 1062 (D.C. 1980) . . . . . . . . . . . . . . . . . . . . . . . 18

*Mendoza v. Comsat Corp.*, 201 F.3d 626 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 20

*Moran v. Audette*, 217 A.2d 653 (D.C. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*National Trade Prods. v. Information Dev. Corp.*, 728 A.2d 106 (D.C. 1999) . . . . . . . . 18

*Railan v. Katyal*, 766 A.2d 998 (D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rastall v. CSX Transp., Inc.*, 697 A.2d 46 (D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Reiman v. International Hospitality Group*, 558 A.2d 1128 (D.C. 1989) . . . . . . . . . . . . 20

*Rugh v. Soleim*, 92 Or. 329, 335, 180 P. 930 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United Farm Agency v. Malanuk*, 284 S.C. 382, 325 S.E.2d 544 (1985) . . . . . . . . . . . . 17

*United States v. Spicer*, 57 F.3d 1152 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Wyoming Realty Co. v. Cook*, 872 P.2d 551 (S. Ct. Wyo. 1994) . . . . . . . . . . . . . . . . . . 17

**<u>STATUTES</u>**                                                   **<u>PAGE(S)</u>**

Connecticut General Statutes 20-325a(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D.C. Code section 42-1702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

D.C. Code section 42-1702(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

D.C. Code section 42-1705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE:**<br><br>**CAPITOL HILL GROUP,**<br><br>        **Debtor.** | **Appeal from U.S. Bankruptcy Court**<br>**Civil Action No. 05-1547 (Sullivan, J.)**<br>**Bankruptcy Case Number 02-0359**<br>**Chapter 11** |

### <u>STATEMENT OF APPELLATE JURISDICTION</u>

Pursuant to 28 U.S.C. 158(a), the Court has jurisdiction over this appeal from the bankruptcy court's final judgment in an adversary proceeding.

### <u>ISSUES PRESENTED</u>

1.      Whether the Bankruptcy Court was correct that D.C. Code 42-1705 precludes real estate brokers performing consulting services without a written listing agreement from receiving compensation contingent on a sale of real estate, even when a written listing agreement would have been inappropriate because the seller/client and broker did not contemplate that the broker would  list the property for sale or procure a buyer.

2.      Whether the Bankruptcy Court was correct that Plaintiff did not have sufficient writings to satisfy the public policy behind the requirement of a "written listing agreement," when the Plaintiff broker faxed two letters to the seller/client stating an entitlement to contingent compensation, and the seller/client continued to use the broker's consulting services and signed real estate contracts that said: "Seller shall be solely responsible for paying the fees and commissions owed to the Bank Companies, pursuant to a separate written agreement."

3.      Whether the Bankruptcy Court was correct in holding that D.C. law establishing that brokers recognized in real estate sales contracts are third party beneficiaries of those

1

contracts did not apply in this case to a client/seller who signed contracts that said, "Seller shall

be solely responsible for paying the fees and commissions owed to the Bank Companies,

pursuant to a separate written agreement."

      4.      Whether the Bankruptcy Court was correct in holding that promissory estoppel

and prevention doctrines did not apply to a client/seller who continued to use the services of a

broker after receiving two letters stating that the broker would receive contingent compensation,

and signed contracts that said, "Seller shall be solely responsible for paying the fees and

commissions owed to the Bank Companies, pursuant to a separate written agreement."

      5.      Whether Plaintiff is entitled to rejection damages when the client/seller avoided a

real estate contract in bankruptcy in order to take advantage of the Washington, D.C. real estate

boom?

## APPLICABLE STANDARD OF APPELLATE REVIEW

      Newmark appeals from the bankruptcy court's resolution of cross-motions for summary

judgment.  Because the bankruptcy court did not make findings resolving disputed facts, but

instead ruled based on what it perceived to be undisputed material facts, the standard of appellate

review is *de novo*.  *United States v. Spicer*, 57 F.3d 1152, 1160 (D.C. Cir. 1995).

## STATEMENT OF THE CASE

      This litigation began on August 2, 2001, when Plaintiff/Claimant/Appellant Newmark of

Washington, D.C. LLC, d/b/a Newmark & Bank Company ("Newmark") filed a Complaint in

the Superior Court for the District of Columbia seeking recovery for breach of contract or

quantum meruit.  After Defendant Capitol Hill Group filed for bankruptcy protection under

Chapter 11, Newmark brought the same claims in bankruptcy court.[1]  The parties filed cross-motions for summary judgment.  After hearing oral argument on the summary judgment motions, and then calling counsel back to re-argue the motions, the Honorable S. Martin Teel issued a 28-page opinion holding that D.C. Code 42-1705 precluded all of Newmark's claims for a commission.[2]  That opinion held that Newmark could receive compensation at an hourly rate of $125.  After the parties stipulated to the number of hours worked by Newmark, the bankruptcy court entered judgment for Newmark in the amount of $10,000 on May 26, 2005.[3]  This timely appeal followed.

## STATEMENT OF FACTS

Laurence Bank, a principal of Newmark, submitted a Declaration to the Bankruptcy Court swearing to the following facts:

    2.        At all times relevant to this Declaration, I was a licensed real estate broker in the District of Columbia.

    3.        In January, 2000, I was a principal in the Laurence Bank Companies, LLC, d/b/a the Bank Companies ("The Bank Companies").  Lisa Benjamin, a licensed real estate broker in the District of Columbia at all times relevant to this Declaration, worked with me at The Bank Companies.

---

[1]Newmark's bankruptcy claim, which attached the Superior Court Complaint, is Addendum 1 to this Brief.  Because Bankruptcy Rule 8008 does not require the filing of an appendix on an appeal to a district court, Newmark's counsel believed that short addenda of key documents from the record would be preferable to a separate appendix, particularly in the new era of electronic filing.

[2]Judge Teel's January 10, 2005 Opinion and Order is Addendum 2 to this Brief.

[3]Judge Teel's May 26, 2005 Order is Addendum 3 to this Brief.

4.      In January 2000, Dr. Peter Shin requested the assistance of The Bank Companies in determining how to maximize economic return from a property at 700 Constitution Ave., N.E. ("the Property").  Dr. Shin was considering leasing the Property to a physicians' group.

5.      I came to understand that Dr. Shin was an authorized representative and principal owner of the corporate entity that owned the Property, Defendant Capitol Hill Group. . . .

6.      Lisa Benjamin and I toured the Property, met repeatedly with Dr. Shin, and reviewed current and prospective leasing arrangements for the Property.  On behalf of the Bank Companies, we recommended residential redevelopment of the Property.

7.      By February, 2000, The Holladay Corporation ("Holladay") had expressed to Dr. Shin an interest in considering purchasing part of the Property for residential redevelopment, or in joint venturing residential redevelopment of part of the Property. Lisa Benjamin and I met with representatives of Holladay to discuss development options, lot pricing, and sale versus participation agreements.  We helped research, review, and negotiate a contract dated March 24, 2000, in which Holladay agreed to purchase part of the Property.

8.      On March 27, 2000, I wrote Dr. Shin a letter confirming the terms on which The Bank Companies were performing services in connection with the Property. The letter provided that The Bank Companies would receive below market compensation for their services at $125 per hour for the time of Lisa Benjamin and myself, and a 1% commission on the purchase price of the Property.  The letter confirmed the terms of an

4

oral agreement where Dr. Shin had requested that The Bank Companies accept below market brokerage compensation because the hospital operating on the Property was not financially strong and Dr. Shin represented that he was interested in a long term business relationship with The Bank Companies.  At Dr. Shin's request, on behalf of The Bank Companies I orally offered the $125 hourly rate and a 1% commission, and Dr. Shin orally agreed to those terms.

9.    The Bank Companies never received a signed copy of the March 27, 2000 letter agreement from Dr. Shin.  However, in accordance with the March 27 agreement, Dr. Shin paid  for the services of Lisa Benjamin and myself at the rate of $125 an hour. Holladay's March, 2000 contract to purchase part of the Property included a study period. During the study period, Lisa Benjamin and I worked with Holladay and Dr. Shin to address title issues, due diligence issues, and Holladay's concerns about costs of relocating utilities.

10.    In continuing to work with Holladay and Dr. Shin, Lisa Benjamin and I analyzed the potential economic returns for the remaining portion of the Property, and advised Dr. Shin that  selling the remainder of the Property for redevelopment would maximize economic benefits to Dr. Shin and Capitol Hill Group.

11.    During this period, the Bank Companies transferred its assets, including the employment services of Ms. Benjamin and myself and the contracts rights to compensation from Capitol Hill Group and Dr. Shin, to a new company, Plaintiff Newmark of Washington D.C. LLC d/b/a Newmark & Bank Company ("Newmark")

12.    In September, 2000, Dr. Shin invited me for a round of golf.  During our

5

golf game, I told Dr. Shin that we had agreed to below market compensation for the initial services performed for Dr. Shin and Capitol Hill Group, but that the services in analyzing the economic benefits of selling the remainder of the Property, and negotiating the sale, called for the normal market rate of a 3% commission on the sale of the remainder of the Property, particularly because Capitol Hill Group and Dr. Shin would realize considerable return from the sale of the Property. Dr. Shin agreed to those terms.

13.    On September 29, 2000, I sent Dr. Shin a letter amending the March 27, 2000 letter agreement. The September 29, 2000 amended agreement provided that Newmark would earn a 1% commission on the sale of the first portion of the Property, and a 3% commission on the sale of the remainder of the Property (described as lot 76, the North Tower). The September 29, 2000 amended agreement provided that the compensation for services at an hourly rate would terminate. Dr. Shin did not return a signed copy of the September 29, 2000 amended agreement, but never rescinded his oral agreement of those terms, and continued to employ the services of Newmark, Lisa Benjamin, and myself.

14.    As a direct result of our efforts, Defendant Capitol Hill Group concluded a contract to sell the remainder of the Property to Holladay. After concluding the contract to sell the remainder of the Property, Dr. Shin announced that he had no intention of paying anything more than $125 hour for the services of Newmark, The Bank Companies, Lisa Benjamin, and myself, and claimed that he had never agreed to pay percentage commissions.

15.    I understand that Capitol Hill Group closed on a portion of the Property in

6

or about April, 2001.  Although I believe Defendant Capitol Hill Group has already received a portion of the sale price for the Property, Dr. Shin and Capitol Hill Group have refused to pay Newmark the agreed commission. . . .[4]

In his deposition, Dr. Shin said, "I didn't consider him [Laurence Bank of Newmark] to be a real estate broker.  He was a real estate adviser."[5]  Dr. Shin also claimed that he felt outrage over paying an hourly invoice from Newmark in April, 2000, and then afterward reviewing Bank's March 27, 2000 letter stating that Newmark would receive a one percent commission on the sale of the Town House Land.  Dr. Shin testified that he was "absolutely certain" that he paid Newmark's hourly invoice before he received Bank's letter of March 27.[6]

Newmark's counsel confronted Dr. Shin with Newmark's invoice, which was dated April 6, 2000, over a week after Bank had faxed his March 27 letter.  Dr. Shin tried to cover his false testimony by claiming that he was out of the office and had not seen Bank's letter for weeks after it arrived:

> Q.  Isn't it true, Dr. Shin, that Mr. Bank had sent you the March 27, 2000 letter before he sent you the invoice?
>
> A.  Yes.
>
> Q.  And you paid the invoice after you had received the March 27, 2000 letter?
>
> A.  The letter was in my office, I had not read it prior to getting this invoice out.
>
> Q.  Well, the check was cut on April 26, 2000, wasn't it?

---

[4]*See* Declaration of Laurence Bank, Addendum 4 to this Brief.

[5]*See* Excerpts from the Deposition of Dr. Peter Shin, 1/16/02 (hereafter "Shin Depo") at 93, Addendum 5 to this Brief.

[6]Shin Depo. at 133, Addendum 5.

A.  Yes.

Q.  So that was a month after the March 27, 2000 letter was sent, wasn't it?

A.  Yes.

Q.  So you had read the March 27, 2000 letter before the Capitol Hill Group paid this invoice, hadn't you?

A.  No, I did not.

Q.  You did not?

A.  I did not.

Q.  So now it's your testimony that you didn't read that March 27, 2000 letter for over a month?

A.  I was out of the office the first two weeks after the letter came and I did not have a chance to read it until after the invoice was paid.

Q.  When was the first time you read the March 27, 2000 letter?

A.  I think a couple of days after the invoice was paid.

Q.  The invoice was paid on April 26 and you remember reading the March 27 letter for the first time several days after April 26?

A.  Yes.[7]

After a break in the deposition for lunch, Dr. Shin admitted that he had been out of town for only a week, in California, and that his office knew where to find him.[8]  Newmark's counsel then confronted Dr. Shin with a fax cover sheet dated March 27, 2000, showing that his office had faxed him a letter from Larry Bank.

Q.  This fax cover sheet indicates that it is from Larry Bank, doesn't it?

---

[7]Shin Depo. at 134-35, Addendum 5.

[8]Shin Depo. at 137-39, Addendum 5.

8

A.  Yes.

Q.  The handwritten notation indicates that it was faxed to Dr. Shin in California, correct?

A.  Yes.

Q.  And that's where you were on March 27, 2000, wasn't it?

A.  I believe I was.[9]

Dr. Shin still refused to acknowledge that he had received Bank's March 27 letter on the date it was sent, saying  "This cover sheet, I do not know what it reflects. . . .  I am not going to draw a conclusion."  Shin stuck to this false testimony because he understood that payment of Newmark's hourly invoice after receiving Bank's March 27 letter (which called for payment of $125 per hour plus a one percent commission on the Town House Land), had ratified the letter's terms.[10]

Dr. Shin testified that he thought Bank's letter of March 27 was "sneaky" and "unethical:"

> I actually felt that this was really a sneaky attack to introduce commission and really try to earn a commission out of a regular consulting business transaction, and that we had paid in good faith by the agreement we reached on an hourly basis, and I was a little bit concerned that 1 percent commission was mentioned in this letter.

> Q.  Did you believe this letter was unethical?

> A.  I absolutely did.

---

[9]Shin Depo. at 143, Addendum 5.  The March 27 fax cover sheet to Dr. Shin and the attached March 27 letter from Bank are Addendum 6 to this Brief.

[10]Shin Depo. at 143, 143-48, Addendum 5.

9

> Q.  Did it cause you not to trust Mr. Bank or his company?
>
> A.  It raised some questions.
>
> Q.  And you wouldn't have someone you didn't trust representing you or your company, would you?
>
> A.  I wouldn't go that far, but I just thought that was uncalled for.[11]

Dr. Shin admitted that despite receiving this "sneaky," "unethical" letter from Bank, he did not send any written communication that the terms of the letter were unacceptable, and he continued to employ Bank and Newmark as "advisers."[12]  Dr. Shin even admitted that after receiving this "sneaky" and "unethical" letter from Bank, Dr. Shin invited Bank to play a round of golf, because "I always like to get to know people who I do business with."[13]

After that round of golf, Bank faxed and mailed Dr. Shin a letter dated September 29, 2000, stating their agreement that Newmark would receive a three percent commission on the Apartment House Land.  Dr. Shin testified as follows:

> Q.  So it's your testimony that you received two letters from Mr. Bank which you considered to be unethical stating his understanding that they were entitled to a commission, and you never put anything in writing that those letters were unacceptable until after the Bank Companies had ceased working on Capitol Hill Group's behalf?
>
> A.  No.  I asked them to give me an hourly bill and they either refused or didn't do it, and I think that the fact that this kind of letter came to me, came to the Capitol Hill Group, shows the kind of operation he is engaged in, and, you know, I believed that at that point, unless there was some reaching of accommodation, that we would probably not be in business together.

---

[11]Shin Depo. at 101, Addendum 5.

[12]Shin Depo. at 110, 160-62, 166, Addendum 5.

[13]Shin Depo. at 111, Addendum 5.

Q.  In other words, when you saw that letter dated September 29, 2000, you said this is not a guy I want to do business with anymore, right?

A.  Let me put it this way.  I think that he was trying to change the terms of the compensation package in the middle of the stream.

Q.  That caused you not to trust him, right?

A.  You know, trust is a commodity that I hold dear.  I had questions.  I don't know if I los[t] compete trust, but I had questions about his business practices.

Q.  And yet you still continued to rely on him and Lisa Benjamin [of Newmark] for advice about this project for months following receipt of that letter, didn't you?

A.  We had some further discussion, yes.

Q.  Fairly intense discussions, right?

A.  I don't know how intense.  Their main assignment was really to give me a good, fair market assessment of the property, and Mr. Seeger was the lead negotiator.  So I don't know whether it was intense or not, but certainly they had a hand in shaping the agreement.

Q.  I mean, you asked them to review every draft of the agreement that went back and forth, didn't you?

A.  Yes.

Q.  And that occurred after you received the letter dated September 29, 2000?

A.  I believe so.

Q.  You were essentially asking a man who you believed to be unethical, who was changing the terms of your deal midstream, to continue to work for you?

A.  Let me put it this way.  I basically felt that this was a ploy on his part to gain additional funds of the Capitol Hill Group and I dismissed it.[14]

---

[14]Shin Depo. at 127-29, Addendum 5.  Bank's September 29, 2000 letter to Dr. Shin is Addendum 7 to this Brief.  One of the most galling aspects of this case is CHG's argument that it should prevail because the D.C. Council required written brokerage contracts to protect the public from unscrupulous brokers.  As Dr. Shin's utterly fantastic testimony demonstrates, it was

11

In his deposition, Dr. Shin acknowledged that he had signed two Purchase and Sale Agreements with the Holladay Corporation, and that both of those contracts contained identical language that "Seller [Capitol Hill Group] has used the services of The Bank Companies (the 'Bank Companies') and Seller shall be solely responsible for paying the fees and commissions owed to the Bank Companies, pursuant to a separate written agreement."[15]   Dr. Shin admitted that CHG and Holladay had exchanged drafts of the agreements and had edited them.  He also admitted that there were no "separate written agreements" between CHG and the Bank Companies other than Bank's letters of March 27 and September 29.[16]

## SUMMARY OF ARGUMENT

D.C. Code section 42-1705 provides that "A licensee shall not receive payment of a commission in the absence of a written listing agreement."  The bankruptcy court's January 10 opinion held that this statute meant that no broker could receive commission-based compensation contingent on the sale of property without a listing agreement, even when a listing agreement would have been inappropriate because the parties did not expect the broker to list the property or find a buyer. The bankruptcy court's opinion obviously sweeps too broadly.   For example, it would preclude buyers' brokers from enforcing their rights to commissions.

The bankruptcy court's opinion also incorrectly held that Dr. Shin's signatures on two real estate sales contracts saying that "Seller shall be solely responsible for paying the fees and commissions owed to the Bank Companies, pursuant to a separate written agreement," were not

the brokers who needed protection from him.

[15]*See* Purchase and Sale Agreements dated 3/24/00 and 12/8/00, paragraphs 5.3, attached as exhibits to Newmark's Claim, Addendum 1 to this Brief..

[16]Shin Depo. at 178, 173-79, Addendum 5.

sufficient to satisfy the writing requirement under 42-1705, and were not sufficient to establish

Newmark's right to a commission under established D.C. precedent that real estate brokers are

third party beneficiaries of real estate sales contracts.

**I.    D.C. CODE 42-1705 DOES NOT APPLY TO NEWMARK'S SERVICES.**

D.C. Code section 42-1705 provides: "A written listing contract is required in the

District for the sale of all real property. A licensee shall not receive payment of a commission in

the absence of a written listing agreement." D.C. Code 42-1702 provides definitions for Chapter

17, "Real Estate Brokers' Duties." Section 42-1702 does not define "commission." Section 42-

1702(14) defines "written listing contract" as follows: "'written listing contract' means a

contract between a broker and an owner in which the owner grants to the broker the right to find

a purchaser for a designated property at the price and terms the owner agrees to accept, and the

broker, for a fee, commission, or other valuable consideration, promises to make a reasonable

effort to obtain a purchaser for the term of the contract."

As Laurence Bank's Declaration makes clear, Newmark did not function as a broker

whose responsibility was "to find a purchaser for a designated property." Newmark provided

consulting services, and advised CHG on a range of issues. Dr. Shin testified, "I didn't consider

him [Laurence Bank of Newmark] to be a real estate broker. He was a real estate adviser."[17]

Bank's letter of September 29, 2000 characterized the relationship as a "consulting and

commission agreement," and said "[w]e are pleased to be advising you on the disposition of this

property and will [continue] to provide unbiased, strategic advice as you continue to analyze

your various options."

---

[17]Shin Depo. at 93, Addendum 5.

13

Despite undisputed evidence from both sides that CHG did not hire Newmark to list the property or find a buyer, the bankruptcy court held that the statute was mandatory and should not be read to apply only to brokers who were hired to find buyers or list property.  In support of its holding, the bankruptcy court erected a straw man:

> a real estate broker who plays a role in the sale of property and later seeks a commission could avoid the effects of D.C. Code section 42-1705's written listing agreement requirement by simply failing to find a buyer, and instead offering the post hoc rationalization that it was really just providing commissionable consulting, not brokerage, services.  By contrast, a broker who actually procured a buyer, but did not have the necessary written listing agreement, would have no recourse even if that broker could demonstrate the existence of an oral understanding.[18]

This logic ignores the basis of Newmark's claim.  If a seller hires a broker to procure a buyer, that broker must have a written listing agreement, and cannot recover a commission whether she finds a buyer or not.  But CHG did not hire Newmark to find a buyer.[19] Accordingly, a listing agreement as defined in 42-1702(14) would have been inconsistent with the agreement between the parties.  As Dr. Shin acknowledged in sworn testimony, he did not

---

[18]Bankruptcy court opinion, January 10, 2005, at 14-15, Addendum 2.

[19]Because Newmark had discussed the property with other prospective buyers during the course of its consulting work for CHG, the bankruptcy court's opinion said that Newmark had done at least some traditional brokerage services.  The bankruptcy court held that the contract between Newmark and CHG was not severable into consulting services versus brokerage services.  Again, the court's logic misses the mark.  The two unsigned letters that confirmed the agreement between the parties did not make Newmark's compensation contingent on Newmark finding a buyer.  Accordingly, no written listing agreement was appropriate or necessary, regardless of whether the court could characterize some of Newmark's activities as "traditional brokerage services."  It is worth noting that the bankruptcy court cited only one case for its holding that Newmark's consulting services were inseparable from traditional brokerage activities,  a 1919 decision from Oregon.  *Rugh v. Soleim*, 92 Or. 329, 335, 180 P. 930, 932 (1919). Bankruptcy court opinion, January 10, 2005, at 11-12, Addendum 2 to this Brief.  A 1919 case from Oregon cannot overrule the D.C. Code's explicit definition of a written listing agreement in section 42-1702(14).

14

hire Newmark as a typical real estate broker. Why, then, would the parties have signed a written listing agreement? Similarly, a buyer's broker is not retained to find a buyer for a seller of property, so a buyer's broker would not sign a written listing agreement with her clients, either. Does that mean that buyers' brokers cannot recover commissions if their clients welch?

The only reasonable interpretation of D.C. Code 42-1705 is that it applies only to brokers claiming commissions for procuring buyers. It does not preclude licensees from entering into oral contracts for consulting services, nor does it preclude consultants from being compensated on the basis of a percentage of a property's sales price. Accordingly, 42-1705 does not even apply to the parties' arrangement, and does not preclude Newmark's claim for compensation based on written contracts or implied-in-fact contracts. *Fred Ezra Co. v. Pedas*, 682 A.2d 173 (D.C. 1996).

## II.    THERE ARE SUFFICIENT WRITINGS TO SATISFY THE PUBLIC POLICY PURPOSE BEHIND SECTION 42-1705.

For the reasons stated in section I. above, Newmark contends that section 42-1705 does not apply to contracts where clients do not hire the brokers to list the property or find a broker. However, to the extent that written contracts are required for consulting services, there are numerous writings in this case to satisfy such a requirement. It is undisputed that Laurence Bank wrote letters to Dr. Shin dated March 27 and September 29, 2000, summarizing Bank's understandings of the agreements between the parties. It is undisputed that Dr. Shin received the letters, never signed them, and never communicated in writing that he did not agree to their contents. CHG also signed two contracts with Holladay unambiguously stating that "Seller [Capitol Hill Group] has used the services of The Bank Companies (the 'Bank Companies') and Seller shall be solely responsible for paying the fees and commissions owed to the Bank

Companies, pursuant to a separate written agreement."

The statute of frauds is closely analogous.  Under D.C. law, the combination of Bank's two letters to Dr. Shin, coupled with Shin's signatures on the real estate sales contracts acknowledging separate written contracts with Newmark, would clearly satisfy the statute of frauds.  *Clay v. Hanson*, 536 A.2d 1097, 1100-01 (D.C. 1988).  Putting the chicken before the egg, the bankruptcy court held that CHG's sales contracts were not sufficient to satisfy the writing requirement because they were not listing agreements and Newmark was not a party to those contracts.[20]   The bankruptcy court ignored the first step of Newmark's two-step argument: (1) Bank's two letters to Shin constituted the writings documenting the contract between the parties; and (2) in the sales contracts, CHG signed writings confirming the contract between the parties.

The bankruptcy court cited a number of cases from other jurisdictions where courts have held that references to brokers in sales contracts were not sufficient to satisfy statutes requiring written listing agreements.[21]   Those cases are not persuasive for a number of reasons.  First, some statutes from other jurisdictions specifically require signatures on a written listing agreement, while the D.C. Code does not.  *See, e.g.*, Connecticut General Statutes 20-325a(b)(5). Second, the cases from other jurisdictions involve sales contracts that do not incorporate other, unsigned written agreements between the broker and seller, as this case does. Third, the cases from other jurisdictions involved procuring broker situations, rather than the consulting services involved here.  Fourth, there is a split of authority from other jurisdictions as to whether

---

[20]January 10, 2005 bankruptcy court opinion at 20-22, Addendum 2 to this Brief.

[21]January 10, 2005 bankruptcy court opinion at 21-22, Addendum 2 to this Brief.

requirements for written listing contracts should preclude legitimate claims for brokerage commissions. *See, e.g.*, *Finlay Commercial Real Estate, Inc. v. Paino*, 133 N.H. 4, 573 A.2d 125 (1990); *United Farm Agency v. Malanuk*, 284 S.C. 382, 325 S.E.2d 544 (1985); *Wyoming Realty Co. v. Cook*, 872 P.2d 551 (S. Ct. Wyo. 1994). And fifth, the cases from other jurisdictions do not purport to overrule clearly established law holding that brokers named in sales contracts are third party beneficiaries, as is the law in the District of Columbia. *See* Section III below.

III.  **CHG'S UNAMBIGUOUS PROMISES IN THE PURCHASE AND SALE AGREEMENTS TO PAY NEWMARK "PURSUANT TO . . . SEPARATE WRITTEN AGREEMENT[S]" ENTITLED NEWMARK TO JUDGMENT.**

Newmark was entitled to summary judgment because CHG signed two contracts with Holladay unambiguously stating that "Seller [Capitol Hill Group] has used the services of The Bank Companies (the 'Bank Companies') and Seller shall be solely responsible for paying the fees and commissions owed to the Bank Companies, pursuant to a separate written agreement." Under clearly-established D.C. law, Newmark is thus a third-party beneficiary of the Purchase and Sale Agreements. As the D.C. Court of Appeals summarized, "[i]n *Moran v. Audette*, 217 A.2d 653 [,654] (D.C. 1966), . . . we held that a broker was a third-party beneficiary of a contract between a landlord and a tenant that required the tenant 'to pay all real estate commissions arising out of the negotiations and execution of the leases,' even though the broker was not expressly named in the agreement." *A.S. Johnson Co. v. Atlantic Masonry Co.*, 693 A.2d 1117, 1123 (D.C. 1997).

Dr. Shin admitted that there are no "separate written agreement[s]" between the parties other than Bank's letters of March 27 and September 29. Dr. Shin admitted receiving those letters, and not contradicting their terms in writing. After receiving those letters, CHG closed on

17

the first contract with Holladay, and signed the second.  CHG is bound by its unambiguous

promises in the Purchase and Sale Agreements to pay Newmark according to the "separate

written agreement[s]."

> With respect to contract interpretation, "summary judgment is appropriate when the
> agreement is unambiguous and where there is no question as to the parties' intent."
> *National Trade Prods. v. Information Dev. Corp*., 728 A.2d 106, 109 (D.C. 1999)
> (citation and quotation omitted).  "A contract is ambiguous 'when it is reasonably
> susceptible of different constructions or interpretations, or of two or more different
> meanings . . . .'"  *Id*. (quoting *Rastall v. CSX Transp., Inc.*, 697 A.2d 46, 51 (D.C. 1997)
> (quotation omitted)) (further citation omitted).

*Deutsch v. Barsky*, 795 A.2d 669, 673 (D.C. 2002).

## IV.    CHG IS ESTOPPED FROM RELYING ON 42-1705.

After receiving Bank's first letter, CHG continued to employ Newmark as consultants,

paid an hourly invoice consistent with the terms of Bank's letter, and closed on the first Purchase

and Sale Agreement with Holladay, in which CHG specifically promised to pay Newmark

according to a "separate written agreement."  After receiving Bank's second letter, CHG

continued to employ Newmark as consultants, and negotiated multiple drafts of a Purchase and

Sale Agreement with Holladay in which CHG, again, specifically promised to pay Newmark

according to a "separate written agreement."

Dr. Shin strung Newmark along so that he could enjoy the benefits of its services at

below market rates.   His conduct fits all three of the classic exceptions to the statute of frauds:

> In the early history of the statute a defendant was denied the privilege of pleading
> [it] in three main instances: (a) where his own fraud was responsible for the non-
> existence of the required signed memorandum [equitable estoppel]; (b) where the
> equitable doctrine of part performance was applicable [promissory estoppel], and
> c) where the defendant has admitted the contract [waiver].

*Railan v. Katyal*, 766 A.2d 998, 1007-08 (D.C. 2001), *quoting Hackney v. Morelite Constr.*, 418

A.2d 1062, 1066 (D.C. 1980)(citation omitted).

The bankruptcy court incorrectly rejected Newmark's equitable estoppel arguments because Newmark was aware that Dr. Shin had not signed the letters.[22]  The bankruptcy court's ruling failed to give proper weight to Dr. Shin's conduct after receiving the letters, and to Newmark's knowledge that Shin had signed sales contracts acknowledging his contract with Newmark.  The bankruptcy court also relied on D.C. Code 42-1705 in rejecting Newmark's equitable arguments.[23]  For the reasons stated in section I above, the bankruptcy court misinterpreted 42-1705.

## V.    THE PREVENTION DOCTRINE PRECLUDES CHG FROM TAKING ADVANTAGE OF ITS OWN BREACH OR REJECTION.

After it filed for bankruptcy, CHG attempted to reject the second sales contract on the property to take advantage of the boom in Washington real estate prices.  The buyer fought CHG's rejection, and was ready, willing, and able to close.  The parties eventually settled.

In the bankruptcy court, CHG argued that because the second sales contract did not close, Newmark was not entitled to compensation.  Newmark argued that the prevention doctrine precluded CHG from avoiding its obligations to pay Newmark.  The bankruptcy court's opinion did not reach the prevention doctrine issue on the merits, because it held that D.C. Code 42-1705 precluded Newmark's underlying claim.[24]

The prevention doctrine clearly applies in this case.  The D.C. Court of Appeals has squarely held that a party who promises to pay a real estate commission contingent on a "sale,"

---

[22]January 10, 2005 bankruptcy court opinion at 22-23, Addendum 2 to this Brief.

[23]January 10, 2005 bankruptcy court opinion at 23, Addendum 2 to this Brief.

[24]January 10, 2005 bankruptcy court opinion at 27, Addendum 2 to this Brief.

or even contingent on "closing," must pay the commission if that party breaches a contract to transfer real estate.  *Reiman v. International Hospitality Group*, 558 A.2d 1128 (D.C. 1989).

     D.C. courts have repeatedly applied the prevention doctrine in the context of brokers who claimed commissions based on procuring buyers for real estate.  *See* summary of procuring cause case law in *Mendoza v. Comsat Corp.*, 201 F.3d 626 (5th Cir. 2000)(applying D.C. law). CHG agreed to pay Newmark a commission for providing consulting and brokerage services that led to a sale.  The prevention doctrine does not apply solely to procuring brokers; "It is a principle of fundamental justice" that applies generally to anyone damaged by a promisor who seeks to benefit from the promisor's own prevention of a condition precedent.  *Aronoff v. Lenkin Co.*, 618 A.2d 669, 682-83 (D.C. 1992). Bank's letters to Dr. Shin did not provide that CHG could breach contracts of sale for the Property.  Accordingly, the prevention doctrine clearly applies here.[25]

## CONCLUSION

     For the foregoing reasons, this Court should reverse the bankruptcy court's January 10, 2005 Opinion and Order, and remand the case with instructions to enter judgment for Newmark based on the sales contracts in which CHG acknowledged its contracts with Newmark.

---

    [25]Because the bankruptcy court held that 42-1705 precluded Newmark's claims for a commission, it did not address Newmark's alternative argument that it was entitled to rejection damages.  Newmark contends that prevention doctrine makes reaching the bankruptcy rejection issue unnecessary; if this Court disagrees, it should at a minimum remand the case for consideration of rejection damages.

## CERTIFICATE OF SERVICE

Newmark's counsel certifies that they have filed this Brief under the Court's electronic filing system, which will automatically provide service to opposing counsel.

Respectfully submitted,

Christopher B. Mead #411598
Mark London
London & Mead
1225 19th Street, N.W., Suite 320
Washington, D.C.  20036
(202) 331-3334

21