# ADDENDUM 5

Peter Shin

Page 1

1      SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2          Civil Division

3    - - - - - - - - - - - - - X

4    NEWMARK OF WASHINGTON D.C.  :

5    LLC d/b/a NEWMARK & BANK     :

6    COMPANY,                     :

7          Plaintiff,  :

8      vs.          :  Case No. 01-5815

9    CAPITOL HILL GROUP, et al., :

10          Defendants. :

11   - - - - - - - - - - - - - X Pages 1-190

12

13        Deposition of PETER SHIN

14        District of Columbia

15      Wednesday, January 16, 2002

16

17

18

19

20

21   Reported by:  Marilyn Feldman, RPR

22   Job No. 142813

**Peter Shin**

1    A.  Whose job?

2    Q.  Yes.

3    A.  I would think that if he didn't agree

4  with it, that he would send a letter and say I

5  disagree, and/or stop working, say I can't work

6  under that circumstance and pull out.

7    Q.  Did you discuss in the second

8  conversation whether anyone would draft a contract

9  to finalize this agreement that you had an

10  understanding that had been reached?

11    A.  No, I don't think there was talk about

12  drafting an agreement.  I think we both understood

13  that to be an agreement that we would abide by,

14  and I expected him to send me a bill in accordance

15  with the number of hours he spent.

16    Q.  Have you either personally or on behalf

17  of any business entities ever done business with a

18  real estate broker in the past without a written

19  agreement?

20    A.  I didn't consider him to be a real

21  estate broker.  He was a real estate adviser.

22    Q.  Dr. Shin, let me focus you on my

**Peter Shin**

Page 101

1    anything.

2        Q.   Well, this letter said that the Bank

3    Companies expected a 1 percent commission on the

4    sale of the property.

5        A.   I actually felt that this was really a

6    sneaky attack to introduce commission and really

7    try to earn a commission out of a regular

8    consulting business transaction, and that we had

9    paid in good faith by the agreement we reached on

10   an hourly basis, and I was a little bit concerned

11   that 1 percent commission was mentioned in this

12   letter.

13       Q.   Did you believe this letter was

14   unethical?

15       A.   I absolutely did.

16       Q.   Did it cause you not to trust Mr. Bank

17   or his company?

18       A.   It raised some questions.

19       Q.   And you wouldn't have someone you

20   didn't trust representing you or your company,

21   would you?

22       A.   I wouldn't go that far, but I just

**Peter Shin**

1     Q.   Did you send Mr. Bank any written

2   communication stating that the March 27, 2000

3   letter was unacceptable to you?

4     A.   In hindsight I should have, but I did

5   not.

6     Q.   So it's your testimony that when you

7   received this letter, you ignored it or dismissed

8   it?

9     A.   I dismissed it.

10    Q.   You believed it was unethical?

11    A.   Yes.

12    Q.   Do you recall playing golf with Larry

13   Bank in the fall or late summer of 2000?

14    A.   Yes.

15    Q.   Where did you play golf together?

16    A.   Golf course.

17    Q.   What was the name of the golf course?

18    A.   It's called PB Golf Course in

19   Germantown I believe.

20    Q.   Are you a member there?

21    A.   No.

22    Q.   Did you invite him out for golf?

**Peter Shin**

Page 111

1    A.   Yes.  A friend of mine owns the golf

2    course.

3    Q.   Why did you invite Mr. Bank to play

4    golf with you?

5    A.   We had discussed golf and he likes to

6    play, I like to play, and I thought it would be a

7    good setting to get to know each other.

8    Q.   Why did you want to get to know

9    Mr. Bank?

10   A.   I always like to get to know people who

11   I do business with.

12   Q.   Who else played golf with you?

13   A.   A friend of mine, Mr. Han.

14   Q.   How is his English?

15   A.   Fairly good.

16   Q.   Do you recall any conservation about

17   compensation with Mr. Bank while you were playing

18   golf?

19   A.   I don't recall any discussion I had

20   with Mr. Bank about compensation.

21   Q.   At that stage when you were playing

22   golf, were you contemplating a deal to sell the

**Peter Shin**

Page 127

1      Q.   You don't remember ever seeing any?

2      A.   No.

3      Q.   So it's your testimony that you

4    received two letters from Mr. Bank which you

5    considered to be unethical stating his

6    understanding that they were entitled to a

7    commission, and you never put anything in writing

8    that those letters were unacceptable until after

9    the Bank Companies had ceased working on Capitol

10   Hill Group's behalf?

11      A.   No.  I asked them to give me an hourly

12   bill and they either refused or didn't do it, and

13   I think that the fact that this kind of letter

14   came to me, came to the Capitol Hill Group, shows

15   the kind of operation he is engaged in and, you

16   know, I believed that at that point, unless there

17   was some reaching of accommodation, that we would

18   probably not be in business together.

19      Q.   In other words, when you saw that

20   letter dated September 29, 2000, you said this is

21   not a guy I want to do business with anymore,

22   right?

**Peter Shin**

1       A.  Let me put it this way.  I think that

2   he was trying to change the terms of the

3   compensation package in the middle of the stream.

4       Q.  That caused you not to trust him,

5   right?

6       A.  You know, trust is a commodity that I

7   hold dear.  I had questions.  I don't know if I

8   loss complete trust, but I had questions about his

9   business practices.

10      Q.  And yet you still continued to rely on

11  him and Lisa Benjamin for advice about this

12  project for months following receipt of that

13  letter, didn't you?

14      A.  We had some further discussions, yes.

15      Q.  Fairly intense discussions, right?

16      A.  I don't know how intense.  Their main

17  assignment was really to give me a good, fair

18  market assessment of the property, and Mr. Seeger

19  was the lead negotiator.  So I don't know whether

20  it was intense or not, but certainly they had a

21  hand in shaping the agreement.

22      Q.  I mean, you asked them to review every

**Peter Shin**

Page 129

1    draft of the agreement that went back and forth,

2    didn't you?

3         A.  Yes.

4         Q.  And that occurred after you received

5    this letter dated September 29, 2000?

6         A.  I believe so.

7         Q.  You were essentially asking a man who

8    you believed to be unethical, who was changing the

9    terms of your deal midstream, to continue to work

10   for you?

11        A.  Let me put it this way.  I basically

12   felt that this was a ploy on his part to gain

13   additional funds of the Capitol Hill Group and I

14   dismissed it.

15        Q.  What do you mean you dismissed it?

16        A.  I did not think this letter was

17   appropriate but we had a business -- we had an

18   understanding and I was going to stick to the

19   original understanding of those terms.  He could

20   send me 10 letters saying I want this or that and

21   he can increase the commission to 50 percent, it

22   really didn't matter to me at that point, we had

**Peter Shin**

Page 133

1    Q.   Dr. Shin, do you remember whether you

2    received the hourly invoice from the Bank

3    Companies before or after the March 27, 2000

4    letter?

5    A.   Well, the outrage that you just

6    displayed is almost equal or less than the outrage

7    that I felt reading this letter after I paid the

8    invoice.

9    Q.   And you are certain you paid the

10   invoice after you received the March 27, 2000

11   letter?

12   A.   Yes.

13       (Shin Exhibit no. 8 was marked

14         for identification.)

15   BY MR. MEAD:

16   Q.   Do you recognize exhibit 8?

17   A.   Yes.

18   Q.   Does it refer to an invoice date?

19   A.   Yes.

20   Q.   April 6 of 2000, correct?

21   A.   Yes.

22   Q.   So that was more than a week after the

**Peter Shin**

Page 134

1    March 27, 2000 letter was faxed to your office,

2    right?

3        A.   I don't know exactly when I received

4    the fax.

5        Q.   Isn't it true, Dr. Shin, that Mr. Bank

6    did not ask you to pay the invoice before sending

7    you the letter, it happened just the opposite way,

8    didn't it?

9        A.   Rephrase that question, please.

10       Q.   Isn't it true, Dr. Shin, that Mr. Bank

11   had sent you the March 27, 2000 letter before he

12   sent you the invoice?

13       A.   Yes.

14       Q.   And you paid the invoice after you had

15   received the March 27, 2000 letter?

16       A.   The letter was in my office, I had not

17   read it prior to getting this invoice out.

18       Q.   Well, the check was cut on April 26,

19   2000, wasn't it?

20       A.   Yes.

21       Q.   So that was a month after the March 27,

22   2000 letter was sent, wasn't it?

**Peter Shin**

Page 135

1    A.   Yes.

2    Q.   So you had read the March 27, 2000

3    letter before the Capitol Hill Group paid this

4    invoice, hadn't you?

5    A.   No, I did not.

6    Q.   You did not?

7    A.   I did not.

8    Q.   So now it's your testimony that you

9    didn't read that March 27, 2000 letter for over a

10   month?

11   A.   I was out of the office the first two

12   weeks after the letter came and I did not have a

13   chance to read it until after the invoice was

14   paid.

15   Q.   When was the first time you read the

16   March 27, 2000 letter?

17   A.   I think a couple of days after the

18   invoice was paid.

19   Q.   The invoice was paid on April 26 and

20   you remember reading the March 27 letter for the

21   first time several days after April 26?

22   A.   Yes.

**Peter Shin**

1    out of town on or about March 27, 2000; is that

2    right?

3        A.   Yes.

4        Q.   Where were you?

5        A.   I believe I was in California.

6        Q.   What were you doing there?

7        A.   I was on a business trip, some personal

8    matters.

9        Q.   How long did that trip last?

10       A.   I'll have to go back and look.

11       Q.   Do you recall roughly how long you were

12   gone?

13       A.   Probably about a week.

14       Q.   Did you then return to the office?

15       A.   Yes.

16       Q.   Other than a trip to California that

17   lasted approximately a week, do you recall being

18   away from your office for any extended period of

19   time in March or April of 2000?

20       A.   My father passed away around April --

21   well, he passed on April 4 of 1999, so we were

22   having a first year anniversary so my mind was

**Peter Shin**

Page 138

1    more occupied with that than hospital business.

2    So I may have been back in town but it was not

3    business as usual.

4        Q.   Other than that approximately week-long

5    trip to California, do you remember being out of

6    your office for any extended period of time?

7        A.   Another week I was out of town.

8        Q.   Where were you?

9        A.   I was local but I didn't go in to the

10   office.

11       Q.   You were taking vacation?

12       A.   Taking care of personal matters.

13       Q.   Was that before or after your trip to

14   California?

15       A.   I believe that was after.  I was

16   constantly in communication with the office.  At

17   this time I didn't go in on an 8-hour a day basis.

18       Q.   When you were in California, did you

19   stay in one place?

20       A.   The company that I associated with has

21   a place there.

22       Q.   With a fax machine?

**Peter Shin**

Page 139

1    A.  Yes.

2    Q.  Were you at that location consistently

3  while you were in California?

4    A.  Yes.

5    Q.  Did your secretaries know how to find

6  you while you were in California?

7    A.  Yes.

8    Q.  You were in daily communication with

9  your office?

10    A.  Yes.

11    Q.  So if there was any problem in

12  receiving a fax transmission, that's something you

13  would have discussed with your secretary at that

14  period of time?

15    A.  Yes, I would assume.

16        (Shin Exhibit no. 9 was marked

17          for identification.)

18  BY MR. MEAD:

19    Q.  Showing you what has been marked as

20  exhibit 9, have you ever seen that document

21  before?

22    A.  This cover sheet?

**Peter Shin**

Page 143

1      A.   This cover sheet, I do not know what it

2    reflects.

3      Q.   Let me ask my question again.  The

4    total number of pages, if this faxed cover sheet

5    was attached to Mr. Bank's two-page letter dated

6    March 27, 2000, it would be three, wouldn't it?

7      A.   Yes.

8      Q.   This fax cover sheet indicates that it

9    is from Larry Bank, doesn't it?

10     A.   Yes.

11     Q.   The handwritten notation indicates that

12   it was faxed to Dr. Shin in California, correct?

13     A.   Yes.

14     Q.   And that's where you were on March 27,

15   2000, wasn't it?

16     A.   I believe I was.

17     Q.   Do you have any reason to doubt that

18   Mr. Bank's March 27, 2000 letter was faxed to you

19   in California on March 27, 2000?

20        MR. CARTER:  Objection, calls for

21   speculation on the part of the witness.

22        THE WITNESS:  Sorry, what was the

**Peter Shin**

Page 144

1    question? .

2    BY MR. MEAD:

3        Q.   Do you have any reason to doubt that

4    Mr. Bank's March 27, 2000 letter to you was faxed

5    to you in California on that same date?

6        A.   Based on this cover sheet, I don't know

7    what letter was attached to that cover sheet,

8    whether this actually was the letter, I don't

9    know, I just don't know.

10       Q.   But you would agree with me that it is

11   more likely than that that Mr. Bank's March 27 --

12       A.   I am not going to draw a conclusion.

13       Q.   First let me finish my question and

14   then please answer to the best of your ability.

15       A.   Okay.

16       Q.   Would you agree it is more likely than

17   not that Mr. Bank's March 27, 2000 letter was

18   attached to this cover sheet?

19       A.   That's a conclusion you will have to

20   draw.  I can't draw that for you.

21       Q.   You can't?

22       A.   I cannot.

**Peter Shin**

Page 145

1    Q.   From your point of view, anything could

2    have been attached to that fax cover sheet?

3    A.   Right.

4    Q.   So you are not able to draw any

5    conclusion about whether Mr. Bank's March 27, 2000

6    letter was attached to this cover sheet?

7    A.   I don't have a recollection of this so

8    I can't speculate.

9    Q.   I am not asking you to speculate.

10   Based on the way that business correspondence is

11   done at your hospital by your secretaries, do you

12   believe that they would fail to communicate to you

13   a letter that Mr. Bank had faxed to them on March

14   27?

15   A.   You know it says here that it was faxed

16   to California.  I don't see a number.  I don't

17   recall receiving this fax in California.  So I

18   don't really know whether in fact it actually was

19   executed and delivered to California.  He says

20   that that letter was faxed.  I don't have a

21   recollection of receiving it.

22   Q.   Your secretaries knew the fax number in

**Peter Shin**

Page 146

1    California to send documents to you in March 2000,

2    didn't they?

3        A.   I would assume.

4        Q.   Don't you also assume, based on looking

5    at this cover sheet and comparing it to Mr. Bank's

6    two-page letter dated March 27, 2000, and

7    recognizing the fax cover sheet and recognizing

8    the fact you were in California on March 27, 2000,

9    don't you also conclude that it is more likely

10   than not that your secretary faxed Larry Bank's

11   March 27, 2000 letter to you in California?

12       A.   Again you are assuming something I do

13   not have knowledge of.  I do not recall receiving

14   this fax in California.

15       Q.   Once again, my question was, do you

16   conclude, based on the information available to

17   you, that your secretary faxed Mr. Bank's March

18   27, 2000 letter to you in California?

19       A.   I cannot say until I talk to the

20   individual and see whether there is a verifiable

21   copy that states that the transmission took place.

22       Q.   Without that you couldn't be sure?

**Peter Shin**

Page 147

1      A.   I don't recall receiving this in

2   California.

3      Q.   Isn't it true, Dr. Shin, that all of

4   your pretended outrage at having paid an invoice

5   before --

6      A.   I object to that question.  You are

7   putting words in my mouth.  It is not a pretended

8   outrage.  I don't like to be described in that

9   fashion.

10      Q.   Once again let me finish my question.

11      A.   Correct your adjectives.

12      Q.   Dr. Shin, isn't it true that your

13   testimony before the lunch break today about being

14   outraged that you had not received Mr. Bank's

15   March 27, 2000 letter before you paid his hourly

16   invoice was in fact an invention, a fiction, a

17   falsehood?

18      A.   I told you to watch your

19   characterization of what I state.  I tell you the

20   truth.  The truth is I did not see this until that

21   invoice was paid.  Whether you believe it or not,

22   that's your problem.  I can only tell you what I

Peter Shin

Page 148

1    know.

2        Q.   Let me ask you to look simultaneously

3    at exhibits 1 and 2 to your deposition. Dr. Shin,

4    let me direct your attention to paragraph 4 of the

5    complaint which is deposition exhibit 1, and

6    paragraph 4 of Capitol Hill Group's answer, which

7    is deposition exhibit 2.  Paragraph 4 reads,

8    "Defendant Peter Shin is a medical doctor, upon

9    information and belief is the primary shareholder

10   in Defendant Capitol Hill Group, and at all times

11   relevant to this complaint was the authorized and

12   apparent agent of Defendant Capitol Hill Group."

13       Paragraph 4 of the answer of Capitol

14   Hill Group denies that paragraph.  Do you see

15   that?

16       A.   Yes.

17       MR. CARTER:  First of all, I have an

18   objection.  Second of all, I would like to go off

19   the record for a moment, Chris, just for a second.

20       MR. MEAD:  Can I ask the witness to

21   leave the room, please?

22       (Witness exits room.)

**Peter Shin**

Page 160

1    that this contract provided for a study period?

2        A.   Yes.

3        Q.   So the first sentence of paragraph 10

4    of the complaint is true, isn't it?

5        A.   Yes.

6        Q.   Directing your attention to the second

7    sentence in paragraph 10 of the complaint, "during

8    the study period, Bank and Benjamin worked with

9    Holladay and Dr. Shin to address title issues, due

10   diligence issues, and Holladay's concerns about

11   costs of relocating utilities."  Is that sentence

12   true?

13       A.   That sentence I believe is partially

14   true.

15       Q.   What is partially true about it?

16       A.   Because they forgot that Mr. Steve

17   Seeger, who was the lead negotiator, is completely

18   left out as if they were the sole adviser.

19       Q.   But the statement that "Bank and

20   Benjamin worked with Holladay and Dr. Shin to

21   address title issues, due diligence issues, and

22   Holladay's concerns about costs of relocating

**Peter Shin**

Page 161

1    utilities" is true, isn't it?

2        A.   No, we never discussed title issues.

3        Q.   You don't recall any discussions about

4    title issues?

5        A.   No, never had a title discussion with

6    Mr. Bank.

7        Q.   You discussed due diligence issues with

8    Mr. Bank, didn't you?

9        A.   Yes.

10       Q.   And you discussed Holladay's concerns

11   about the costs of relocating utilities, didn't

12   you?

13       A.   Yes.

14       Q.   Directing your attention to paragraph

15   11 in the complaint, "in continuing to work with

16   Holladay and Dr. Shin, Benjamin and Bank analyzed

17   the potential economic returns for the remaining

18   portion of the property and advised Dr. Shin that

19   selling the remainder of the property for

20   redevelopment would maximize economic benefits to

21   Dr. Shin and Capitol Hill Group." Is that

22   sentence true?

**Peter Shin**

Page 162

1        A.   Again, I believe they had a hand in

2    advising me, but again they were not the sole

3    advisers.

4        Q.   But this paragraph doesn't allege they

5    were the sole advisers, does it?

6        A.   By omission I believe it has the

7    appearance that they were the sole advisers.

8        Q.   Other than your belief that they are

9    omitting the participation of other parties,

10   paragraph 11 of the complaint is true, isn't it?

11       A.   I would say yes.

12       Q.   Directing your attention to paragraph

13   12 of the complaint, first sentence, "in September

14   2000, Dr. Shin invited Laurence Bank for a round

15   of golf."  That sentence is true isn't it?

16       A.   Yes.

17       Q.   Second sentence, "during their golf

18   game, Bank, acting on behalf of Newmark, told Shin

19   that he had agreed to below market compensation

20   for the initial services performed for Dr. Shin

21   and Capitol Hill Group."  Is that sentence true?

22       A.   I don't think that it was -- we did not

**Peter Shin**

Page 166

1    March 27 agreement so there was nothing for me to

2    rescind.

3        Q.   So you deny the truth of the second

4    clause in paragraph 14, correct?

5        A.   Yes, I would agree to that.

6        Q.   In other words, you deny it, you

7    wouldn't agree to its contents, you deny the

8    contents?

9        A.   I would deny it.

10       Q.   The third clause says that you

11   "continued to employ the services of Newmark, Bank

12   and Benjamin."  That is true, isn't it?

13       A.   I continued to employ services but my

14   feeling at the time was that it's up to Mr. Bank

15   to inform me if he did not agree to the original

16   agreement to terminate, and in the absence of that

17   termination I continued to employ the services.

18       Q.   Original agreement to terminate?

19       A.   I said that if -- I had an

20   understanding, whether he accepted it or not,

21   whether he understood, I don't know, but I know

22   what I accepted, it was an hourly rate.  In the

Peter Shin

Page 173

1    it begin with the word "broker" underlined?

2         A.  Yes.

3         Q.  Doesn't it also say that seller -- that

4    would be Capitol Hill Group, correct?

5         A.  Yes.

6         Q.  -- "has used the services of the Bank

7    Companies and seller shall be solely responsible

8    for paying the fees and commissions owed to the

9    Bank Companies pursuant to a separate written

10   agreement"?

11        A.  Yes.

12        Q.  Did you sign this contract on behalf of

13   the Capitol Hill Group?

14        A.  Are you asking a question that because

15   I signed this agreement that I acknowledged the

16   fact that I have hired Mr. Bank's company as our

17   broker?

18        Q.  What I asked you was, directing your

19   attention to page 25, did you sign this contract

20   on behalf of Capitol Hill Group?

21        A.  I signed the contract, but the fact

22   that I signed the contract is no reflection or

**Peter Shin**

Page 174

1    admission on the part of Capitol Hill Group to

2    have engaged Mr. Bank as a broker.

3        Q.   It says here that there is a separate

4    written agreement for paying fees and commissions

5    to the Bank Companies, doesn't it?

6        A.   This is what the purchaser's attorney

7    wrote.

8        Q.   And you and your attorneys reviewed

9    drafts and made edits to the contract as you

10   deemed it appropriate over a period of months,

11   didn't you?

12       A.   Let's say that this was not the

13   highlight of our discussion on the purchase and

14   sales agreement.

15       Q.   Dr. Shin, if you could focus on my

16   questions, we would be done quicker.

17       MR. CARTER:  Counsel, I resent that

18   statement.  Will you stop badgering my client?

19       MR. MEAD:  I am not badgering.  He is

20   wasting my time.

21       THE WITNESS:  Wait a minute.  You are

22   wasting my time.  I will answer the question the

**Peter Shin**

Page 175

1   way I think it should be answered and if you want

2   me to come back tomorrow, I will be here.  I will

3   take my time and answer the question the way I see

4   fit.

5   BY MR. MEAD:

6       Q.   Dr. Shin, my question to you is, isn't

7   it true that you and your attorneys edited drafts

8   of this contract --

9       MR. CARTER:  Lawyer-client

10  relationship.  I object.  You are asking for

11  conversations in matters which occurred between

12  him and his attorneys, counsel.

13  BY MR. MEAD:

14      Q.   Just to clarify, isn't it true that you

15  and your attorneys exchanged edited drafts with

16  the Holladay Corporation?

17      MR. CARTER:  Once again I object, part

18  of the lawyer-client relationship.

19      MR. MEAD:  There is no privilege that

20  extends to negotiations between the other party at

21  the --

22      MR. CARTER:  No, you said you and your

### Peter Shin

1  attorney exchanged documents.  I'm not going to

2  have him admitting to what he and his attorneys

3  exchanged and/or discussed.

4  BY MR. MEAD:

5     Q.  Isn't it true, Dr. Shin, that

6  representatives of the Capitol Hill Group

7  exchanged edits with representatives of the

8  Holladay Corporation --

9        MR. CARTER:  Objection, clarification

10  for the word representatives, could mean attorney.

11       MR. MEAD:  It is meant to include

12  attorney.

13       MR. CARTER:  Then don't answer the

14  question.  It's covered by the privilege.

15       MR. MEAD:  Can you please explain to me

16  how an exchange of correspondence between two

17  entities negotiating a contract can be

18  attorney-client privilege?

19       MR. CARTER:  Can you explain to me why

20  you are asking him what he and his attorneys did?

21  You are representing Mr. Bank over there, you are

22  asking questions about what his relationship with

**Peter Shin**

Page 177

1    Bank is.  That's what I think the questions should

2    be about, at least if I were doing your job.  You

3    know he was represented by counsel.  I can't allow

4    that.  If you have questions that you want to ask

5    him about what he and his lawyer did, you need to

6    get the other lawyer in the room and have him

7    waive the privilege.

8    BY MR. MEAD:

9        Q.   Once again, Dr. Shin, in correspondence

10   to the Holladay Corporation, did representatives

11   of Capitol Hill Group propose edits to drafts of

12   this contract?

13       MR. CARTER:  Once again, I'm raising

14   the same objection, lawyer-client, since you have

15   defined it as including his attorneys.

16   BY MR. MEAD:

17       Q.   How many drafts of the contract were

18   exchanged between the Holladay Corporation and

19   Capitol Hill Group?

20       A.   I don't know the exact number.

21       Q.   More than five?

22       A.   Less than that.

**Peter Shin**

Page 178

1      Q.   In each draft, both sides proposed

2    edits, didn't they?

3      A.   Yes.

4      Q.   You reviewed each draft carefully

5    yourself, didn't you?

6      A.   Certain portions of it.

7      Q.   And you proposed edits where you

8    believed them appropriate, didn't you?

9      A.   I believe so.

10      Q.   Was there a separate written agreement

11    between Capitol Hill Group and the Bank Companies?

12      A.   There was not.

13      Q.   Other than the March 27, 2000 letter

14    and the September 29, 2000 letter, are you aware

15    of any written agreements reflecting compensation

16    to be paid to the Bank Companies by Capitol Hill

17    Group?

18        MR. CARTER:  Objection, asked and

19    answered.

20        THE WITNESS:  Repeat that question,

21    please.

22        (Record read.)

**Peter Shin**

Page 179

1          THE WITNESS:  I do not.

2    BY MR. MEAD:

3          Q.   Let me direct your attention to

4    deposition exhibit 10, the March 2000 agreement.

5    I direct you to page 15 of that exhibit.  The

6    March 2000 agreement with the Holladay Corporation

7    and Capitol Hill Group also has a paragraph 5.3

8    titled "broker," doesn't it?

9          A.   Yes.

10          Q.   That contract also provides that

11    "seller has used the services of the Bank

12    Companies and seller shall be solely responsible

13    for paying the fees and commissions owed to the

14    Bank Companies pursuant to a separate written

15    agreement."  That's what the contract provides,

16    doesn't it?

17          A.   Yes.

18          Q.   You signed that contract on behalf of

19    Capitol Hill Group, didn't you?

20          A.   I signed the contract, but that

21    apparently is a paragraph or sentence that should

22    have been deleted.