**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**IN RE CAPITOL HILL GROUP, DEBTOR.**

**ADVERSARY PROCEEDING:**

**NEWMARK OF WASHINGTON, D.C. LLC, D/B/A NEWMARK & BANK**
**COMPANY,**
**Appellant,**

v.

**CAPITOL HILL GROUP,**
**Appellee**

---

**ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(The Honorable S. Martin Teel, Jr. United States Bankruptcy Judge)**

---

**BRIEF OF APPELLANT**

---

Stephen M. Seeger
Quagliano & Seeger, PC
2620 P Street, NW
Washington, D.C.  20007
Tel. (202) 822-8838
Fax. (202) 822-6982
e-mail: sseeger@quagseeg.com

*Attorneys for*
*Capitol Hill Group*

**CIVIL ACTION NO. 05-1547 (Sullivan, J.)**
Bankruptcy Case Number 02-0359 (Chapter 11)

# TABLE OF CONTENTS

|  | PAGE(S) |
|---|---|
| TABLE OF AUTHORITIES | ii |
| ISSUES PRESENTED | 1 |
| STATEMENT OF FACTS | 2 |
| SUMMARY OF ARGUMENT | 8 |
| ARGUMENT | 9 |
| I.  D.C. CODE 42-1705 DOES NOT APPLY TO NEWMARK'S SERVICES | 9 |
| A.  Absent a Written Agreement, Licensed Real Estate Brokers Are Not Entitled to Recover Commissions Under Equitable Theories. | 10 |
| B.  Percentage of the Property's Sale Price is a Commission. | 10 |
| C.  Newmark Provided Traditional Brokerage Services Within the Scope of D.C. Code §42-1705. | 12 |
| II.  NEWMARK DOES NOT SATISFY D.C. CODE § 42-1705. | 13 |
| III.  CHG IS NOT ESTOPPED FROM RELYING ON 42-1705. | 18 |
| IV.  THE PREVENTION DOCTRINE IS INAPPLICABLE. | 20 |
| CONCLUSION | 20 |
| CERTIFICATE OF SERVICE (by electronic filing) | 21 |

# TABLE OF AUTHORITIES

| CASES | PAGE(S) |
|---|---|
| *American Express Travel Related Services Co. v. Beryle,*<br>414 S.E.2d 499, 202 Ga. App. 358, cert. denied,<br>1992 Ga. Lexis 191 (Ga. Ct. App. 1992) | 19 |
| *Bensen v. Gall,* 605 A.2d 841, 158 Vt. 106 (1992) | 15, 20 |
| *Boehnlien v. Ansco, Inc.,* 657 P.2d 702,<br>61 Or.App.398 (Or. Ct. App. 1983) | 19 |
| *Brah v. Bence,* 532 N.W.2d 145, 191 Wis.2d 827 (Wis. Ct. App. 1995) | 20 |
| *Buckingham v. Stille,* 379 N.W.2d 30 (Iowa Ct. App. 1985) | 20 |
| *Century 21 Schaeffer Associates Realtors, Inc. v. Elsmere Realty Co.,*<br>1999 Del. Super Lexis 169 (Del. Super. Ct. 1999) | 15 |
| *Crocket v. Lowther,* 549 P.2d 303, 310 (Wyo. 1976) | 16 |
| *EDM & Assocs. v. GEM Cellular,* 597 A.2d 384, 387 (D.C.1991) | 9 |
| *Elmore v. Wiley,* 478 S.W.2d 137 (Tex. App. 1972) | 15 |
| *Frohn v. Central Trust Co.,* 72 N.E.2d 303 (Ohio Ct. App. 1946) | 16 |
| *Gerardot v. Emenhiser,* 363 N.E.2d 1072,<br>173 Ind. App. 353 (Ind. Ct. App. 1977) | 9 |
| *Grayson v. Dungan,* 628 So.2d 445 (Ala.1993) | 18 |
| *Hursey Porter & Associates v. Bounds,* 1994 Del. Super.<br>Lexis 583 (Del. Super. Ct. 1994) | 15 |
| *Kassatly v. Yazbeck,* 734 F. Supp. 13 (D.D.C. 1990) | 12 |
| *Kexby Hall Real Estate, Ltd. v. Technology Park Associates,*<br>1989 Minn. App. Lexis 1204 (Minn. Ct. App. 1989) | 15 |
| *McCutcheon & Burr, Inc. v. Berman,* 590 A.2d 438,<br>218 Conn. 512 (Conn. 1991) | 9 |
| *RPD Development Corp. v. Schwartz,* 657 A.2d 301 (D.C. 1995) | 9, 12 |

| CASES | PAGE(S) |
|---|---|
| *Sorg v. Fred Weisz & Associates*, 91 Cal.Rptr.918, 14 Cal. App.3d 78 (Cal. Ct. App. 1970) | 19 |
| *Stella v. Wilmington Savings Fund Society*, 1993 WL 138697 * 11 (Del.Super.1993) (unpublished opinion) | 13, 19 |
| *Stephen A. Goldberg, Co. v. Remsen Partners, Ltd.*, 170 F.3d 191 (D.C. Cir. 1999) | 12 |
| *Southwestern Stationary & Bank Supply, Inc. v. Harris Corp.*, 624 F.2d 168, 170 (10ᵗʰ Cir. 1980) | 16 |
| *Tenants of 738 Longfellow St., N.W. v. District of Columbia Rental Hous. Comm'n*, 575 A.2d 1205 (D.C.1990) | 9 |
| *Van Shoiack v. United States Liability Ins. Co.*, 133 A.2d 509 (Pa. 1957) | 16 |
| *Vaulx v. Cumis Insurance Society, Inc.*, 407 A.2d 262 (D.C. App. 1978) | 16 |
| *Walker v. Palm West Hosp., Inc.*, 819 So.2d 904 (Fla. Dist. Ct. App. 2002) | 19 |
| *William Klingensmith, Inc. v. Reliance Ins. Co.*, 370 A.2d 1341 (D.C. 1977) | 18 |

**TREATISES AND OTHER**

| | |
|---|---|
| Blacks Law Dictionary 264, (7th ed. 1999) | 11 |
| Restatement 2d of Contracts § 60 | 16 |

**STATUTES**

| | |
|---|---|
| D.C. Code §§ 42-1701 *et seq.* | *passim* |
| D.C. Code §§ 42-1705 | *passim* |
| Delaware Real Estate Commission Rules, Regulation VII.A | 9 |
| Minn. Stat. § 82.33 | 9 |
| Conn. Gen. Stat. § 20-325a | 9 |
| Vermont Real Estate Commission Rule 26 | 9 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:

CAPITOL HILL GROUP,

Debtor.

Appeal from U.S. Bankruptcy Court
Civil Action No. 05-1547 (Sullivan, J.)
Bankruptcy Case Number 02-0359
Chapter 11

## ISSUES PRESENTED

1.      Whether the Bankruptcy Court held correctly that D.C. Code § 42-1705,
which expressly provides that a licensed real estate broker "shall not receive payment of a
commission in the absence of a written listing agreement," supercedes prior case law
permitting real estate brokers to receive a commission without a written listing agreement
under equitable theories of recovery.

2.      Whether the Bankruptcy Court correctly held that a licensed real estate
broker's receipt of a percentage of the sale price for real property for services rendered
for such sale, constitutes receipt of a commission.

3.      Whether the Bankruptcy Court correctly relied, in part, on Appellant
Newmark's description of its work as "real estate brokerage and sales services" in
holding that Appellant in fact provided real estate brokerage services.

4.      Whether the Bankruptcy Court correctly relied, in part, on Appellant
Newmark's description of its requested payment as a "commission," in holding that D.C.
Code § 42-1705 barred recovery of a commission absent a written agreement.

5.      Whether the Bankruptcy Court correctly held that it is unreasonable for
Appellee's silence to constitute acceptance of Appellant Newmark's proposed written

agreement when Appellant explicitly instructed that the method to accept its written agreement was by signing it, and returning it to Appellant Newmark.

6.      Whether the Bankruptcy Court correctly held that the written agreement requirement in D.C. Code § 42-1705 was not satisfied by conglomerating documents between different parties where the facts indicate that there was no intention to create any rights for Appellant Newmark.

7.      Whether the Bankruptcy Court properly concluded that equitable estoppel did not prevent a party from denying the existence of an alleged contract it never signed or otherwise acknowledged when the offer contained an express instruction that acceptance should be indicated through signature and return of the letter to the offeror.

## STATEMENT OF FACTS

1.      Capitol Hill Group ("CHG") is a non-profit mutual benefit corporation that owns certain real property at 700 Constitution Ave., N.E. (the "Property").
(Addendum 1[1], Newmark's Complaint, ¶ 3).

2.      Laurence Bank ("Bank") and Lisa Benjamin ("Benjamin") are licensed real estate brokers in the District of Columbia. Bank was a principal in Newmark[2], and Benjamin was an employee and Bank's assistant. (Addendum 4, Bank Declaration, ¶¶ 2 and 3.)

3.      In January 2000, Newmark provided real estate services to CHG regarding its Property. (Addendum 4, Bank Declaration, ¶ 4.)

---

[1] The "Addendum" are exhibits to the Brief of Appellant, which are not re-copied and attached hereto. Exhibits to the Brief of Appellee are referred to as "Attachments."

[2] Newmark is actually the successor-in-interest to business entity for which this action is brought -- The Laurence Bank Companies, LLC, d/b/a The Bank Companies. (Addendum 2, Newmark's Complaint, ¶ 2). For purposes of expedience, CHG will refer to Newmark as the active party in the transaction.

4.      Newmark discussed with The Holladay Corporation ("Holladay")

developing, pricing, and selling the Property. (Addendum 4, Bank Declaration, ¶ 7.)

5.      Newmark reviewed and negotiated CHG's contract to sell the Property to

Holladay. (Addendum 4, Bank Declaration, ¶ 7.)

6.      On March 24, 2000, Holladay and CHG executed a Purchase and Sale

Agreement for part of the Property. Appellant Newmark is not a signator to the Purchase

and Sale Agreement. (Addendum 1, Purchase and Sale Agreement; Addendum 4, Bank

Declaration, ¶ 7.)

7.      Section 5.3 of the Purchase and Sale Agreement provides:

Broker. Seller and Purchaser each represents to the other that it has not had
dealings, negotiations, or consultation with any broker, representative, employee,
agent or other intermediary in connection with the sale of the Property, except that
Purchaser has used the services of Julien J. Studley, Inc. (the "Broker") and
Purchaser shall be solely responsible for paying the fees and commissions owed
to the Broker, pursuant to a separate written agreement and except that Seller has
used the services of The Bank Companies (the "Bank Companies") and Seller
shall be solely responsible for paying the fees and commissions owed to the Bank
Companies, pursuant to a separate written agreement. Seller and Purchaser each
agree that each will indemnify, defend, and hold the other free and harmless from
the claims of any other broker(s), representative(s), employee(s), agent(s) or other
intermediary(ies) claiming to have represented Seller or Purchaser, respectively,
or otherwise to be entitled to compensation in connection with this Agreement or
in connection with the sale of the Property. This mutual indemnity shall survive
Closing and any termination of this Agreement. (emphasis supplied).

8.      As of March 24, 2000, Appellant Newmark had never tendered a written

agreement regarding its fees or commissions.

9.      Neither CHG nor Holladay intended Section 5.3 to confer any benefit

upon Appellant Newmark. (Attachment 1, Shin Affidavit ¶¶ 15-16, Attachment 2,

Bamberger Affidavit, ¶¶ 13-15).

4

10.    On March 27, 2000, after the Purchase Agreement was signed by

Holladay and CHG, Newmark wrote a letter regarding its fees and commissions to Dr.

Peter Shin, of MedLINK Hospital and Nursing Center.  The fee and commission letter

was not addressed to CHG, the Property owner as clearly identified in the contract

Newmark reviewed and negotiated.  (Addendum 6, March 27, 2000 letter).

11.    Newmark's March 27, 2000 letter begins as follows:

This letter sets forth the terms and conditions under which The Bank Companies
will perform *real estate brokerage and sales services* **on your behalf** in
connection with the sale of 700 Constitution Avenue (Property), N.E. and related
matters.  **You** understand that this letter is prompted by ethical considerations as
well as our desire to have a clear understanding with **you** in regard to the services
**to be performed for and on your behalf.**

(Emphasis supplied).  (Addendum 6, March 27, 2000 letter).

12.    Newmark goes on assert the "current hourly rates" for Bank and Benjamin

and that "[o]ur *fees* generally will be based upon the amount of time spent by our real

estate professionals and support staff. …  We will provide you with a detailed invoice

(generally on a monthly basis) showing the current charges for our services …."

(Emphasis supplied).  (Addendum 6, March 27, 2000 letter).

13.    Newmark's March 27 letter states further:

In addition to the *fee* as outlined above, if the property is sold during the term of
this agreement or to any Purchaser who was identified during and/or within two
(2) years after the Agreement's termination, [Newmark] shall earn *a commission
of one percent (1%) of the purchase price of the Property. Said commission*
shall be paid out of Seller's proceeds at settlement.

(Emphasis supplied).  (Addendum 6, March 27, 2000 letter).

14.    Newmark does not differentiate the services it proposed would be

compensated by the fee from the services it proposed would be compensated by the

commission.  (Addendum 6, March 27, 2000 letter).

5

15.     Newmark dictated the method for Dr. Shin to accept the terms of

Newmark's fee and commission letter. It provided:

If the arrangements set forth above are agreeable, please acknowledge **your**
understanding thereof and agreement thereto by having the enclosed two (2)
copies of this letter dated and executed in the space provided below and returning
one executed copy thereof to us.

(Emphasis supplied). (Addendum 6, March 27 letter).

16.     Dr. Shin never signed Newmark's March 27, 2000 letter and Newmark

never received executed copies of the letter as it requested. (Addendum 1, Newmark's

Complaint ¶ 9).

17.     On April 6, 2000, Newmark submitted to Dr. Peter Shin, Medlink Hospital

& Nursing Cen., an invoice for hourly "Brokerage Services Rendered: consulting

services for redevelopment of Capitol Hill Hospital." Newmark submitted no other

invoices for its services to either Dr. Shin or Appellant CHG. (Attachment 1, Shin

Affidavit ¶ 8 and Exhibit 2 thereto.)

18.     Newmark was paid in full on its sole invoice. (Addendum 1, Newmark's

Complaint ¶ 9).

19.     In September 2000, CHG decided to offer the remainder of the Property

for sale. Bank claims he told Shin that Newmark's services associated with such

transaction "called for a normal market rate of *a 3% commission on the sale of the*

remainder of the Property …." (Addendum 4, Bank Declaration ¶ 12).

20.     On September 29, 2000, Newmark wrote a letter to Dr. Peter Shin, of

MedLINK Hospital and Nursing Center. The September 29, 2000 letter starts:

This letter amends the earlier consulting and *commission agreement* dated March
27, 2000 regarding the sale and development of Capitol Hill Hospital.

Newmark then states that the sale of the *commission* for the original portion of the property will be one percent (1%) and the *commission* for the balance of the Property will be three percent (3%). (Emphasis supplied). (Addendum 7, September 29, 2000 letter).

21.    Like the letter of March 27, 2000, the September 29, 2000, proposed amendment states:

> If the arrangements set forth above are agreeable, please acknowledge **your** understanding thereof and agreement thereto by having the enclosed two (2) copies of this letter dated and executed in the space provided below and returning one executed copy thereof to us.

(Emphasis supplied). (Addendum 7, September 29, 2000 letter).

22.    The September 29, 2000, proposed amendment contains a complete signature block to signify that it was "Agreed & Accepted" by "Dr. Peter Shin." Nowhere in the September 29, 2000, letter is there any reference to CHG, the Property owner despite Newmark's allegedly in depth involvement in the transaction. (Addendum 7, September 29, 2000 letter).

23.    Shin never signed Newmark's September 29, 2000 letter and Newmark never received executed copies of the letter as it requested. (Addendum 4, Bank Declaration ¶ 13).

24.    Shin and CHG advised Newmark that there was no agreement as to the payment of commissions and that no commissions were due on the sale of Property. (Addendum 4, Bank Declaration ¶ 14).

25.    Newmark spent a total of eighty (80) hours working on the sale of the Property. (Addendum 3, Order of the Bankruptcy Court pursuant to stipulation of the parties).

26. On August 2, 2001, Newmark sued CHG and Peter Shin in the Superior Court of the District of Columbia asserting counts of breach of contract and *quantum meruit*. (Addendum 1, Complaint).

27. In its Complaint, Newmark states, "*this lawsuit involves brokerage services* performed in connection with the sale of property in the District of Columbia." (Emphasis supplied). (Addendum 1, Complaint ¶ 1).

28. Newmark asserted that "Dr. Shin's statement that he would not pay any percentage commissions constitutes an anticipatory breach of the contracts between the parties." (Addendum 1, Complaint ¶ 20).

29. After CHG filed for bankruptcy, Newmark filed a Proof of Claim asserting that it was entitled to compensation for services performed in the amount of $454,025 which it calculated on the attached "Amount of Claim" as:

*Commission* for services rendered:

Purchase and Sale agreement dated March 24, 2000:
Sale Amount: $3,000,000
*Commission Amount (1%)* $30,000
***
Purchase and Sale agreement dated December 8, 2000:
Sale Amount: $13,300,000
*Commission Amount (1%)* $399,000

(Emphasis supplied). (Addendum 1, Proof of Claim).

30. On December 8, 2000, Holladay and CHG executed a Purchase and Sale Agreement for the remainder of the Property. Appellant Newmark is not a signator to the December 8, 2000, Purchase and Sale Agreement. The December 8, 2000, Purchase and Sale Agreement contains the identical provision regarding Brokers at Section 5.3 that was in the March 27, 2000, Purchase and Sale Agreement.

31.    Neither CHG nor Holladay intended Section 5.3 to confer any benefit upon Appellant Newmark. (Attachment 1, Shin Affidavit ¶¶ 15 and 16; Attachment 2, Bamberger Affidavit, ¶¶ 13 - 15).

32.    Newmark previously engaged in litigation to recover commissions without a written fee agreement. (Attachment 3, Holladay Affidavit, ¶¶ 3-5).

## SUMMARY OF ARGUMENT

Although expressly required under District of Columbia law, Appellant Newmark can point to no single document that evidences an agreement for CHG to pay a commission on the sale of its real property. Confronted with this troublesome reality, Newmark tries to create a written agreement with CHG from Newmark's letters to a non-party, Dr. Peter Shin of Medlink Hospital and Nursing Center. The letters it relies upon were to have been accepted by signature. No one signed the letters. Still undeterred, Newmark, argues that a contract between CHG and another non-party ratify the letter offers and, miraculously, create a contract between Newmark and CHG.

As demonstrated below, these arguments defy logic and the law. Most poignantly, however, they defy the clear intention of the District of Columbia Real Estate Licensure Act which was enacted to "protect the public against incompetence, fraud and deception in real estate transactions." D.C. Code §§ 42-1701 et seq. That Act precludes a licensee from recovering a commission absent a written agreement. Appellant is a licensee. There is no written agreement. This Court should uphold the decision of the Bankruptcy Court and protect CHG "against incompetence, fraud and deception in real estate transactions."

# ARGUMENT

## I.   D.C. CODE § 42-1705 APPLIES TO NEWMARK'S SERVICES

Chapter 17 of the D.C. Code sets forth the duties of real estate brokers in the

District of Columbia.  Section 42-1701 of the D.C. Code, states that "[t]he purposes of

this subchapter are to protect the public against incompetence, fraud and deception in real

estate transactions ...."  The District of Columbia Court of Appeals has enforced the Real

Estate Licensure Act to its letter in order to protect the public. "Given the broad remedial

objectives of the Act, we construe it generously and will not create an exception to the

legislative mandate which would exempt from the Act's coverage the most lucrative area

of brokerage practice." *RPD Development Corp. v. Schwartz*, 657 A.2d 301, 307 (D.C.

1995) (citing *EDM & Assocs. v. GEM Cellular*, 597 A.2d 384, 387 (D.C.1991)) (citing

*Tenants of 738 Longfellow St., N.W. v. District of Columbia Rental Hous. Comm'n*, 575

A.2d 1205, 1211 (D.C.1990) (holding that a remedial statute must be accorded generous

construction to achieve its purposes)).[3]

---

[3] Several other jurisdictions have enacted similar statutes and regulations in
connection with real estate broker agreements. *See, e.g.,* Delaware Real Estate
Commission Rules, Regulation VII.A.; Minn. Stat. § 82.33; Conn. Gen. Stat. § 20-325a;
Vermont Real Estate Commission Rule 26. Like the District's Real Estate Licensure
Statute, the purpose of these other statues is to "protect the public against incompetence,
fraud and deception in real estate transactions ...." *See also, Gerardot v. Emenhiser*, 363
N.E.2d 1072, 1075, 173 Ind. App. 353, 357 (Ind. Ct. App. 1977) ("The specific purpose
of IC 1971, 32-2-1, supra, is to prevent disputes over the terms of commission contract
for the sale of real estate.") A broker who does not follow the mandate of such statutes
does so at his or her own peril. *See McCutcheon & Burr, Inc. v. Berman*, 590 A.2d 438,
442, 218 Conn. 512, 520 (Conn. 1991).

**A.      Absent a Written Agreement, Licensed Real Estate Brokers Are Not Entitled to Recover Commissions Under Equitable Theories.**

In 1997, Section 42-1705 of the D.C. Code was amended to specifically bar recovery of real estate commissions absent a written agreement. The statute now provides:

A written listing contract is required in the District for the sale of all real property. *A licensee shall not receive payment of a commission in the absence of a written listing agreement.*

D.C. Code § 42-1705 (emphasis supplied). The Bankruptcy Court reviewed the law predating amendment of D.C. Code § 42-1705 and correctly determined that the 1997 amendment "overrules prior case law that permitted brokers to collect commissions on equitable theories such as quantum meruit." (Addendum 2, p. 10).

On appeal, Newmark apparently abandons its earlier arguments that D.C. Code § 42-1705 does not preclude a real estate broker from recovering a commission under equitable theories. It no longer claims entitlement under quantum meruit or unjust enrichment. Instead, Newmark attempts to avoid § 42-1705 by calling the commission it seeks an alternative fee arrangement.

**B.      Percentage of the Property's Sale Price Is a Commission.**

The Bankruptcy Court rejected Newmark's effort to call its commission an alternative fee arrangement in order to avoid the statute. (Addendum 5, p. 18).

Newmark urges this Court to understand D.C. Code § 42-1705 differently from its clear, common sense meaning. It suggests that § 42-1705 is inapplicable because licensed real estate brokers may be paid a percentage of the sale price (what is typically understood as

a commission[4]) for providing services other than procuring buyers. Specifically, Newmark asserts that:

> The only reasonable interpretation of D.C. Code 42-1705 is that it applies only to brokers claiming commissions for procuring buyers. It does not preclude licensees from entering into oral contracts for consulting services, nor does it preclude consultants from being compensated on the basis of a percentage of a property's sale price.

(Brief of Appellant, p. 15.) Newmark cites to no case law or legislative history in support of this brash statement. And no wonder: its suggested interpretation of § 42-1705 would eviscerate the statute. If Newmark's understanding were the law, brokers would always be free to argue that they did something other than procure a buyer – they assisted in pricing the property, negotiated the contract terms, assisted in fulfilling conditions to closing, etc. – and are thus entitled to a "percentage of the property's sale price."

This is nonsense. The statute should be read as it is written. Licensed real estate brokers cannot recover a "percentage of the property's sale price," also known as a commission, unless it has a written agreement providing for payment of the "percentage of the property's sale price," also known as a commission. This Court should note that Appellant Newmark never disdained the use of the term "commission" until now. In all communications with CHG and Dr. Shin, Newmark referred to the "percentage of the property's sale price" as a "commission." Newmark asserted in its Complaint that it was entitled to recover a "commission." Newmark calculated its damages in its Proof of Claim as a "commission." Only now, when it fully appreciated that a commission

---

[4] Black's defines "a real estate agent's commission" as "a fee paid to an agent or employee for a particular transaction, usually as a percentage of the money received from the transaction." Blacks Law Dictionary 264, (7th ed. 1999).

12

requires a written agreement, has Newmark changed its terminology and adopted "percentage of the property's sale price."

The Bankruptcy Court was right. A commission is a commission. Its holding should be affirmed.

### C.   Newmark Provided Traditional Brokerage Services Within the Scope of D.C. Code §42-1705.

In a related effort to dodge D.C. Code §§ 42-1705, Newmark seeks to recast the services it provided. Rather than being "licensed real estate brokers in the District of Columbia" who allegedly "provided brokerage services," Newmark now argues that it was not a broker (citing approvingly Dr. Shin's deposition testimony that he did not consider Mr. Bank or Newmark to be a broker).

District of Columbia Courts have long and summarily dispensed with those who walk like a broker, and talk like a broker, but argue that they are something else to avoid Title 17 of the D.C. Code. For example, in *RPD Development Corp. v. Schwarz*, 657 A.2d 301 (D.C. 1995), the Court found that payment of a commission was sufficient evidence that a party was acting as a broker. The *RPD Development* Court stated:

the fact that RDP's compensation under the contract was to be paid on a commission basis contingent upon success in the leasing of real property with the amount tied directly to the value of the lease, an element common to real estate brokerage contracts, underscores the conclusion that RPD contracted to perform and acted as a real estate broker.

*Id.* at 306. In *Kassatly v. Yazbeck*, 734 F. Supp. 13 (D.D.C. 1990), the plaintiff, asserting a right to a percentage commission, argued that he was not a broker. The court agreed with the defendant, stating in relevant part that where the commission claimant "takes any part in the negotiations, no matter how slight, he will be considered a 'broker.'" *Id.* at 15. *See also, Stephen A. Goldberg, Co. v. Remsen Partners, Ltd.,* 170 F.3d 191, 194

(D.C. Cir. 1999) (despite a party's identification of its role as that of consultant, the court found that its participation in negotiations for lease of property and receipt of a commission based on the lease's value were the services of a real estate broker under the statute.)

The Bankruptcy Court carefully reviewed the facts of this case, giving particular regard to Newmark's description of its own services, and concluded that Newmark in fact provided real estate brokerage services. (Addendum 5, pp. 10 – 18). The Bankruptcy Court's well thought and clearly articulated reasons should be upheld.

**II.    NEWMARK DOES NOT SATISFY D.C. CODE § 42-1705.**

Standing alone, the unsigned March 27, 2000 and September 29, 2000, letters do not satisfy the requirement for a written agreement under D.C. Code § 42-1705.

Newmark does not argue to the contrary.

Newmark argues that multiple documents can satisfy D.C. Code § 42-1705, which should be interpreted in a similar fashion as the statute of frauds.[5] To the contrary, the very fact that a D.C. Code § 42-1705 exists suggests that the D.C. Council recognized a need for a writing requirement for brokerage agreements separate and distinct from the statute of frauds. Indeed, the Code's purpose is to protect the public from "incompetence, fraud and deception in real estate transactions." D.C. Code § 42-1501.

In *Stella v. Wilmington Savings Fund Society*, 1993 WL 138697 * 11 (Del.Super.1993) (unpublished opinion), the Superior Court of Delaware reviewed a regulation similar to D.C. Code § 42-1705 and determined that the principals governing the statute of frauds

[5] The Bankruptcy Court did not decide the issue. For the purpose if its decision, it accepted Newmark's theory, but stated that it did so "with serious doubts." (Addendum 3, p.21, n.6).

14

are inapplicable because unlike the regulation requiring brokerage agreements to be in

writing, which no broker can be "blamelessly ignorant" of, the statute of frauds was

intended to protect both sophisticated and unsophisticated parties. As such, there is no

support for Newmark's position that interpretations of the statute of fraud should be

applied to D.C. Code § 42-1705.

Nevertheless, Newmark argues that the unsigned Letters *combined* with the

Purchase Agreement satisfy Section 42-1705's written requirement. Specifically,

Newmark argues that the following sentence contained in Section 5.3 of the Purchase

Agreement provides the necessary link to the unsigned Letters to transform the Letters

into binding contracts:

5.3 Broker. Seller and Purchaser each represents to the other that it has had
dealings, negotiations, or consultation with any broker, representative,
employee, agent or other intermediary in connection with the sale of the
Property, except that Purchaser has used the services of Julien J. Studley, Inc.
(the "Broker) and Purchaser shall be solely responsible for paying the fees and
commissions owed to the Broker, pursuant to a separate written agreement
and except that Seller has used the services of The Bank Companies (the
"Bank Companies") and Seller shall be solely responsible for paying the fees
and commissions owed to the Bank Companies, pursuant to a separate written
*agreement*. Seller and Purchaser each agree that each will indemnify, defend,
and hold the other free and harmless from the claims of any other broker(s),
representative(s), employee(s), agent(s) or other intermediary(ies) claiming to
have represented Seller or Purchaser, respectively, or otherwise to be entitled
to compensation in connection with this Agreement or in connection with the
sale of the Property. This mutual indemnity shall survive Closing and any
termination of this Agreement. (emphasis supplied).

The Bankruptcy Court rejected Newmark's argument that Purchase and Sale

Agreement, read in conjunction with Newmark's letters, satisfy the writing requirement

of D.C. Code 42-1705. It thoughtfully reasoned that a contract to which Newmark is not

a party cannot overcome the necessity to obtain a written signature on its letters.

15

(Addendum 2, pp. 19–22).[6] Newmark offers no authority to contradict the logic of the Bankruptcy Court.

Nor can it credibly argue that the purpose of Article 5.3 in the Purchase and Sale Agreement was intended for Newmark's benefit. As evidenced by the Affidavit of Rita Bamberger, Holladay did not intend Newmark to be a beneficiary of the sales contact. Holladay cared only that CHG would only be responsible to pay its own Broker. (Attachment 2, ¶¶ 13 and 14). CHG similarly denies that Newmark was an intended beneficiary of the Purchase and Sale Agreement. (Attachment 1, ¶¶ 15 and 16). Newmark offers no fact to contradict these affidavits. At best, Newmark is an unintended third party beneficiary of the sales contact. Newmark submits nothing to support the proposition that an unintended third-party beneficiary can rely on a tertiary document to satisfy a broker's statutory requirement for a writing or any other statute of frauds.

This Court should further note that there is *no* common party between, on the one hand, the Purchase and Sale Agreement (executed by CHG and Holladay) and, on the other hand, the purported fee agreements (sent by Newmark to Dr. Peter Shin, Medlink Hospital and Nursing Center, to be signed by Dr. Peter Shin personally). (Addendum 1, Purchase and Sale Agreement; Addendum 6 and 7, Newmark letters of March 27 and September 29, 2000). Consistently, Newmark submitted its invoice for payment to Dr. Peter Shin at Medlink Hospital & Nursing Cen. (Attachment 1, Exhibit 2). It defies

---

[6] In similar circumstances, courts declined to find that multiple documents satisfied the respective statute in question requiring a written listing agreement. *Hursey Porter & Associates v. Bounds*, 1994 Del. Super. Lexis 583 (Del. Super. Ct. 1994), *Bensen v. Gall*, 605 A.2d 841, 158 Vt. 106 (1992); *Kexby Hall Real Estate, Ltd. v. Technology Park Associates*, 1989 Minn. App. Lexis 1204 (Minn. Ct. App. 1989); *Elmore v. Wiley*, 478 S.W.2d 137 (Tex. App. 1972); and *Century 21 Schaeffer Associates Realtors, Inc. v. Elsmere Realty Co.*, 1999 Del. Super Lexis 169 (Del. Super. Ct. 1999).

logic that Newmark, who asserts to have been so intimately involved in the transaction,

would submit its proposed fee agreement and invoice for services rendered to a non-party

yet seek to foist the obligation to pay commissions upon a party with which it was

supposedly ¶s involved.

Further, this Court should hold Newmark to the terms of its offer which called for

acceptance by a specific mode – signature of the letter and return to Newmark. It is well

settled that an offeror is entitled to prescribe the method of acceptance of its offer. *Vaulx*

*v. Cunis Insurance Society, Inc.*, 407 A.2d 262, 264 (D.C. App. 1978). When an offer

prescribes the method of acceptance "its terms in this respect must be complied with in

order to create a contract." Restatement 2d of Contracts § 60; *Vaulx*, 407 A.2d at 264.

Acceptance by any other method than what is prescribed in the offer will be considered

"a counter-offer, not a binding acceptance." *Vaulx*, 407 A.2d at 264.[1] In this case,

Newmark's offer prescribed that Dr. Shin could accept the offer by signing and returning

the offer to Newmark. Dr. Shin never signed the offer on behalf of himself, Medilink

Hospital and Nursing Center, or CHG. Newmark knew that it was not signed or returned

to its offices. Accordingly, no one accepted the offer and no contract exists. *Id.*

Finally, this Court should take careful note of the chronology. The initial

Purchase and Sale Agreement was executed *before* Newmark sent its letter of March 27,

---

[1] *See also, Southwestern Stationary & Bank Supply, Inc. v. Harris Corp.*, 624 F.2d
168, 170 (10th Cir. 1980) ("clause required written acceptance" and "in the absence of
written acceptance" there is no contract); *Crocket v. Lowther*, 549 P.2d 303, 310 (Wyo.
1976)("Where it is apparent that acceptance depends upon signatures and it is not signed,
there is no validating of the acceptance. In the absence of signatures where intended,
there is no valid contract."), citing *Frohn v. Central Trust Co.*, 72 N.E.2d 303 (Ohio Ct.
App. 1946); *Van Shoiack v. United States Liability Ins. Co.*, 133 A.2d 509, 515 (Pa.
1957) ("absent compliance with the 'sign and return' term, no option contract can be said
to have come into existence").

2000. A pre-existing writing cannot ratify a subsequent offer. Thus, Newmark can only argue that the writing requirement is satisfied by its letter of September 29, 2000, and the December 8, 2000, Purchase and Sale Agreement.

Under those circumstances, the Court must consider again the purpose of the Real Estate Licensure Act – "to protect the public against incompetence, fraud and deception in real estate transactions." As of September 29, 2000, Newmark's March 27, 2000, letter had not been accepted in the prescribed manner. Newmark certainly knew that. (Addendum 4, Bank Declaration ¶9). Newmark never stated how or why it believed Dr. Shin, Medlink Hospital and Nursing Center, or CHG had accepted the March 27, 2000 letter. (Addendum 7). It simply pretended there was a contract. In its letter of September 29, 2000, Newmark refers its March 27, 2000, letter as a "consulting and commission agreement," and unilaterally proposed to amend it.[8] (Addendum 7). Newmark did not assert its right to payment of a commission at the closing of the first portion of the Property in April 2001 as it did when it believed the balance of the Property would close. (Addendum 1, Newmark's Complaint ¶15; Addendum 4, Bank Declaration ¶¶ 15, 18 and 21). In other words, Newmark sat in silence hoping to trap CHG into a commission agreement to which it never agreed or signed.

Newmark's actions in this matter tracked its action in another transaction with Holladay where it leveraged a settlement payment in a commission dispute without a signed commission agreement. (Attachment 3). This Court should not reward such unscrupulous behavior. Newmark is an experienced and licensed broker. It is charged

---

[8] Note that Newmark did not contemporaneously suggest the September 29, 2000 letter was a separate and new contract. It was proposed as an amendment. If there was no underlying agreement – and there was not – there can be no amendment.

with knowledge of District of Columbia real estate laws. It knew the import of a written

agreement and chose to flout the law. Newmark should not be permitted to cobble

together a "written agreement" when it was responsible to obtain one, failed to do so, and

then sought to fabricate an agreement after the fact.

### III.   CHG IS NOT ESTOPPED FROM RELYING ON D.C. CODE § 42-1705

Newmark argues that the CHG's alleged failure to repudiate the offer letters sent

by Newmark equitably estops the CHG from arguing that Section 42-1705 precludes

Newmark's commission. As discussed above, Newmark's hands are dirty in this regard.

It thus cannot invoke equitable doctrines such as estoppel.

Moreover, CHG did nothing improper. Bank sent Dr. Shin and Capitol Hill

Hospital and Nursing Center a single invoice, which was promptly paid. All actions by

Dr. Shin and CHG were consistent with the understanding that Newmark would be paid

only on an hourly basis.

Finally, Dr. Shin was under no obligation to repudiate the offer letters from

Newmark. That fact cannot now be used against CHG to bolster Newmark's argument

that a valid commission agreement between the parties exists. See, e.g., *William*

*Klingensmith, Inc. v. Reliance Ins. Co.*, 370 A.2d 1341 (D.C. 1977) (silence in response

to letter purporting to settle dispute does not constitute acceptance of an offer; citing the

Restatement (Second) of Contracts, court states "the general principle that an offeror

ordinarily lacks the power to make an offeree's silence result in an acceptance.").[9]

---

[9] Other jurisdictions employ identical reasoning. *See, e.g., Grayson v. Dungan,*
628 So.2d 445, 447 (Ala.1993)("a person's failure to reply to a letter received by him,
which is not shown to have been part of a mutual correspondence, is not admissible in
favor of the writer and against the recipient as evidence of the truth of the statements

In *Stella v. Wilmington Savings Fund Society*, 1993 Del. Super. Lexis 134 (Del.

Super. Ct. 1993), the broker argued that defenses akin to those provided by the statute of

frauds should be implied from Delaware's statutory requirement that listing agreements

be in writing.  The court disagreed, and stated that

"[i]f the purpose of [Delaware's] statutory requirement that listing agreements be
in writing] was to solely serve as the equivalent of statute of frauds, these
arguments might be more persuasive.  However, contrary to [the broker's]
argument, the distinctions between the statute of frauds and [the Delaware statute]
are more significant.  Whereas the broad purpose of the statute of frauds is to
avoid actions between any parties involving certain types of contracts which may
be fraudulently alleged to exist, [the Delaware statute] is intended to protect the
general public against fraud by a specific group of persons in a specific
context...no real estate broker can be blamelessly ignorant of [the Delaware
statute].  Nor is there any inequity in holding real estate brokers responsible for
complying with a regulation which they are bound to learn in order to obtain a
license to practice in this state ... The Court finds that the purpose of [the
Delaware statute] is best served if a duly executed listing agreement is the sole
vehicle upon which a broker can predicate recovery of any commission, without
exceptions of the sort [broker] has argued in this case.

contained in the letter.  The failure to reply is not considered an implied admission by the
recipient."); *Sorg v. Fred Weisz & Associates*, 91 Cal.Rptr.918, 919, 14 Cal. App.3d 78,
81 (Cal. Ct. App. 1970) ("The tactic of attempting to create a contract by a letter setting a
price, on the theory that silence and inaction would constitute an acceptance, has been
consistently rejected by the courts."); *Walker v. Palm West Hosp., Inc.*, 819 So.2d 904
(Fla. Dist. Ct. App. 2002)(letter purportedly confirming settlement of claim that was
never responded to by defendant insufficient to establish settlement); *Boehlien v. Ansco,
Inc.*, 657 P.2d 702, 705, 61 Or.App.398, 394, (Or. Ct. App. 1983) ("The law is quite clear
that an acceptance by silence can only arise when the circumstances existing are such that
a duty arises requiring a party to speak...A duty to speak then can arise only when an
offeror has a right to demand some action on the part of the offeree."); *American Express
Travel Related Services Co. v. Beryle*, 414 S.E.2d 499, 501, 202 Ga. App. 358, 360, cert.
denied, 1992 Ga. Lexis 191 (Ga. Ct. App. 1992)("A failure to reply to the statements
made in a letter, which is not part of a mutual correspondence is not considered an
implied admission by the addressee of the truth of the statements.").

*Id.* at *34-36 (citations omitted).[10] Accordingly, Newmark cannot rely upon theories of

equitable estoppel to sidestep the requirements of a written listing agreement as specified

in D.C. Code Section 42-1705.

### IV.    THE PREVENTION DOCTRINE IS INAPPLICABLE.

The Bankruptcy Court rightly concluded that the doctrine of prevention only

arises in the event that Newmark establishes an underlying right to payment of a

commission. Because Newmark failed to establish that right, it rejected any application

of the prevention doctrine. (Addendum 2, p. 27.) Newmark's argument on appeal are

predicated on its establishment of an underlying right to receive a commission. As

demonstrated above, the Bankruptcy Court correctly denied the existence of an

underlying right to receive a commission. In the event that this Court overturns that

aspect of the Bankruptcy Court's decision, possible application of the prevention should

be remanded. It was not decided below and need not be addressed here.

### CONCLUSION

For the foregoing reasons, this Court should affirm the Opinion and Order of the

Bankruptcy Court.

---

[10] *See also, Bensen v. Gall, supra* ("where violation of the rule or statute requiring a written listing agreement is a defense to the claim for a commission, the defense cannot be avoided on unjust enrichment or equitable estoppel theories."); *McCutcheon and Burr,* 590 A.2d at 530 (plaintiff's invocation of equitable principles is attempt to "effect an end run around the requirements of Section 20-325a(b). Listing contracts are governed exclusively by Section 20-325a ... to allow the plaintiff to recover under [equitable] theories would nullify Section 20-325a and emasculate the state's real estate sales licensing system.") *Buckingham v. Stille,* 379 N.W.2d 30 (Iowa Ct. App. 1985)(court rejects equitable estoppel arguments a they would thwart purpose of statute requiring written listing agreement); *Brah v. Bence,* 532 N.W.2d 145, 191 Wis.2d 827 (Wis. Ct. App. 1995) (promissory estoppel cannot be used solely to "end run" applicable statute requiring written listing agreements).

**DATED: August 29, 2005**

Respectfully submitted,

Stephen M. Seeger
QUAGLIANO & SEEGER, P.C.
2620 P Street, NW
Washington, D.C. 20007
Phone: 202-822-8838
Fax: 202-822-6982
E-mail: sseeger@quagseeg.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Brief of Appellee was transmitted electronically, on August 29, 2005, to:

Christopher C. Mead, Esq.
1225 19th Street, NW
Suite 320
Washington, D.C. 20036
cmead@londonandmead.com

**Counsel for Newmark of Washington, D.C. LLC
d/b/a Newmark & Bank, Company**

Stephen M. Seeger