# ATTACHMENT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>**CAPITOL HILL GROUP,**<br><br>Debtor. | Case Number 02-03591<br>Chapter 11 |

**AFFIDAVIT OF PETER C. SHIN MADE IN CONNECTION WITH CAPITOL HILL GROUP'S OBJECTION TO THE PROOF OF CLAIM FILED BY NEWMARK OF WASHINGTON D.C. LLC d/b/a NEWMARK & BANK COMPANY**

DISTRICT OF COLUMBIA  ) ss.

Peter C. Shin, being first duly sworn upon oath, states and deposes as follows:

1. I am over the age of 18 and I am competent to testify as to the matters set forth herein based upon my personal knowledge. If called to testify, my testimony would be consistent with that set forth in this Affidavit.

2. My name is Peter C. Shin. I am the President of Capitol Hill Group ("**CHG**"), a corporation organized under the laws of California.

3. In my professional capacity, I was the lead business negotiator at CHG with respect to (a) that certain Purchase and Sale Agreement dated as of March 24, 2000, by and between the Holladay Corporation ("**Holladay**") and CHG (the "**March 2000 Sale Agreement**"), and (b) that certain Purchase and Sale Agreement dated as of December 8, 2000, by and between Holladay and CHG (the "**December 2000 Sale Agreement**," together the "**Sale Agreements**").

4. On behalf of CHG, I was the sole person responsible for negotiating with Mr. Laurence D. Bank ("**Bank**") with respect to the terms and conditions of CHG's engagement of Bank and his company with respect to two or three alternative transactions contemplated by CHG during 2000, including in connection with a transaction between CHG and Holladay.

5. I received the letters attached hereto as **Exhibits 1-A and 1-B**. I never signed these letters and after having received these letters, I never affirmed or ratified the terms of the letters. Also, I never caused CHG to post the retainer requested in Exhibit 1-A. I unequivocally assert that Exhibits 1-A and 1-B do not constitute, represent or otherwise reflect an agreement between CHG and the sender (although CHG agreed to pay Newmark at the rate of $125 per hour for services actually performed). Exhibits 1-A and 1-B do not constitute a written agreement between CHG and Newmark.

6. Contrary to the contents of Exhibit 1-A and 1-B, at no time (whether prior to or after the dates of the letters) did I ever agree (verbally or otherwise) that CHG would pay Bank a commission based on a sale by CHG of its real estate to Holladay (or any alternative purchaser), whether as a traditional brokerage commission or alternatively as extra or supplemental compensation for services rendered by paying Bank, based on the sale of real estate to Holladay.

7. Consistent with certain contents of Exhibit 1-A and 1-B, I did agree that CHG would pay what Bank (in such letters) discusses as "our then-prevailing hourly charges and disbursements," and that "Our current hourly rates" of "$125 for Laurance Banks and Lisa Benjamin, $100 for their associates, and generally lower rates for services rendered by [others.]" I dispute Bank's assertion in this proceeding, belied by the foregoing, that these letters "provided that The Bank Companies would receive below market compensation for their services at $125 per hour for the time of Lisa Benjamin and [Bank.]" At no time did Bank state to me that he and his colleagues would charge CHG hourly rates that were "below market."

8. With respect to the services rendered by Bank to CHG, Bank sent a single invoice for seven (7) hours of work. See **Exhibit 2**. CHG timely paid said invoice. Despite CHG's repeated requests that Bank supply CHG with additional invoices, CHG has received no invoices from Bank other than that attached hereto as Exhibit 2.

9.  The individual primarily responsible for negotiating with Holladay for CHG was CHG's real estate transactional lawyer, Stephen M. Seeger, Esq., not Bank or his company. Indeed, after approximately March 2000, Bank and his colleagues attended very few, if any, face-to-face meetings (or conference calls) where CHG and Holladay were present, and I never authorized Bank to meet alone with Holladay regarding CHG matters.

10. Bank did not procure or identify Holladay (or anyone else) as a potential purchaser of CHG's real estate, as Holladay first approached me, personally, through Holladay's broker, Julien Studley, Inc.

11. While I acknowledge that Bank rendered certain services to CHG during 2000, CHG's sale of the so-called Town House Land (as defined in the Sale Agreements) to Holladay in May of 2001 was not "as a direct result of our [Bank's] efforts," as Bank has asserted in connection with this dispute.

12. Section 5.3 in the March 2000 Sale Agreement is identical to Section 5.3 in the December 2000 Sale Agreement ("**Section 5.3**"). It reads in full:

> 5.3 Broker. Seller and Purchaser each represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary in connection with the sale of the Property, except that Purchaser has used the services of Julien J. Studley, Inc. (the "Broker") and Purchaser shall be solely responsible for paying the fees and commissions owed to the Broker, pursuant to a separate written agreement and except that Seller has used the services of The Bank Companies (the "Bank Companies") and Seller shall be solely responsible for paying the fees and commissions owed to the Bank Companies, pursuant to a separate written agreement. Seller and Purchaser agree that each will indemnify, defend and hold the other free and harmless from the claims of any other broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Seller or Purchaser, respectively, or otherwise to be entitled to compensation in connection with this Agreement or in connection with the sale of the Property. This mutual indemnity shall survive Closing and any termination of this Agreement.

13. I was directly involved with the negotiation of the Sale Agreements, including Section 5.3.

14. I have no recollection of discussing the terms of Section 5.3 with Bank or his colleagues.

15. The purpose of Section 5.3 is simply to recognize that real estate services companies were involved in the transaction and to recognize that they were to be paid pursuant to separate agreements outside of the sale contract; that Studley would be compensated by Holladay (not CHG), and that Bank would be compensated by CHG (not Holladay) pursuant to any agreement it had with Bank.

16. Bank was not intended by CHG to be a beneficiary of or under Section 5.3 or either of the Sale Agreements.

17. CHG intended that, at least as to CHG, any "separate written agreement" with a "Broker" would be in writing and signed by the Broker and the seller or buyer, as the case may be.

18. While Bank only sent CHG one invoice for Bank's services (Exhibit 2), I acknowledge that Bank provided other (although minimal) services for which CHG has always been willing to pay, assuming they are reasonable (although CHG does not waive any payment defenses or other rights CHG may possess).

19. Upon CHG's engagement of Stephen Seeger, Esq. to represent CHG in its negotiations with Holladay, which occurred in approximately February of 2000, Bank and his colleagues had very limited involvement in the CHG-Holladay transaction.

20. At all times during my tenure with CHG, I have understood, generally speaking, the role of a commercial real estate sales broker: introducing a buyer to a seller, or vice versa, and being paid a commission for such service. In fact, CHG recently entered into an agreement

4

with a real estate broker whose services include sales brokerage services. See **Exhibit 3** attached hereto. CHG never agreed to any such arrangement with Bank or his company, whether compensation is described as a brokerage commission or as a supplement to hourly rates (to compensate for alleged under-market hourly rates).

21.    I am aware of an alleged dispute involving Bank and Holladay relating to commissions claimed by Bank relative to real estate located in Virginia, and a payment by Holladay and others to Bank (despite their belief that Bank was not entitled to a commission), made, as I understand it, simply to avoid protracted litigation, fees and expenses. While I am unaware of the details of this dispute, I first learned of the existence of this dispute (from Holladay) in the Fall of 2000.

22.    Inasmuch as this Affidavit is submitted in connection with CHG's opposition to a specific Cross Motion of Newmark for summary judgment, my failure to address any allegations not relevant to the Cross Motion should not be taken as a concession with respect to such allegations, all of CHG's rights being specifically reserved.

Further affiant saith not.

_____
Peter C. Shin

Subscribed and sworn to before me

This 10th day of February, 2003.



March 27, 2000

Dr. Peter Shin
MedLINK Hospital and Nursing Center
700 Constitution Avenue, N.E.
Washington, D.C. 20002

Dear Peter:

This letter sets forth the terms and conditions under which The Bank Companies will perform real estate brokerage and sales services on your behalf in connection with the sale of 700 Constitution Avenue (Property), N.E. and related matters. You understand that this letter is prompted by ethical considerations as well as our desire to have a clear understanding with you in regard to the services to be performed for and on your behalf.

In accordance with our company's policy, we will require an advance retainer of $1,500. We will apply this retainer against our then-prevailing hourly charges and disbursements. Our current hourly rates are $125 for Laurence Bank and Lisa Benjamin, $100 for their associates, and generally lower rates for services rendered by other assistants. Our fees generally will be based upon the amount of time spent by our real estate professionals and support staff on your behalf and certain expenses incurred by us that are allocable to the representation. We will provide you with a detailed invoice (generally on a monthly basis) showing the current charges for our services and application of any payments or amounts drawn from the retainer as described below.

In addition to the fee as outlined above, if the Property is sold during the term of this agreement or to any Purchaser who was identified during and/or within two (2) years after the Agreements termination, The Bank Companies shall earn a commission of one percent (1%) of the purchase price of the Property. Said commission shall be paid out of Seller's proceeds at settlement.

In addition to the payment of our fees, you are responsible for all out-of-pocket disbursements and expenses, such as long distance telephone calls, photocopying charges, messenger and express delivery services, travel expenses, overtime secretarial charges, filing and recordation fees and other costs which we may incur or advance on your behalf in the course of our representation.

1341 Connecticut Avenue, N.W.
Washington, D.C. 20036
202-331-7000
202-331-7010 Fax

EXHIBIT
1A
ALLSTATE LEGAL SUPPLY CO.

We expect that all statements will be paid within 30 days after being rendered.

If the arrangements set forth above are agreeable, please acknowledge your understanding thereof and agreement thereto by having the enclosed two (2) copies of this letter dated and executed in the space provided below and returning one executed copy thereof to us.

We are pleased that you have asked us to handle this matter for you and we look forward to working with you. Please do not hesitate to call me directly if you have any questions regarding the terms of this engagement or any other questions relating to the work for which you have engaged us.

THE BANK COMPANIES,

By: _____
Laurence D. Bank, President

AGREED AND ACCEPTED THIS
____ day of March, 2000.

_____

_____

EXHIBIT C

# NEWMARK
## NEWMARK & BANK COMPANY

September 29, 2000

Dr. Peter Shin
MedLINK Hospital and Nursing Center
700 Constitution Avenue, N.E.
Washington, D.C. 20002

Re: Amendment to March 27, 2000 Consulting and Commission Agreement

Dear Peter:

This letter amends the earlier consulting and commission agreement dated March 27, 2000 regarding the sale and development of Capitol Hill Hospital. We are pleased to be advising you on the disposition of this property, and will to provide unbiased, strategic advice as you continue to analyze your various options.

In accordance with our March 27 agreement, Newmark & Bank Company will earn a commission equal to one percent (1%) of the Purchase Price of the Property, described as Square 865 (the parking lot) and Square 895 (the apartment parcel) with lot 76 (the North Tower) excluded from sale. This amends that agreement to reflect that upon sale of lot 76 (the North Tower), Newmark & Bank Company will earn a commission of three percent (3%) of the Purchase Price allocated to that parcel. This amendment also terminates the hourly consulting fee structure described in the prior agreement. An invoice for any consulting services prior to September 29, 2000 will be submitted for your review and approval as previously agreed to.

If the arrangements set forth above are agreeable, please acknowledge your understanding thereof and agreement thereto by having the enclosed two (2) copies of this letter dated and executed in the space provided below and returning one executed copy thereof to us.

We are pleased that you have asked us to handle this matter for you and we look forward to working with you. Please do not hesitate to call me directly if you have any questions regarding the terms of this engagement or any other questions relating to the work for which you have engaged us.

Newmark & Bank Company

Laurence D. Bank, President

AGREED & ACCEPTED

Dr. Peter Shin
Date:_____

EXHIBIT 1B

G:\Larry\Contracts & Agreements\2000\Dr. 34 Shin Engagement Ltr.doc

NEWMARK OF WASHINGTON D.C. LLC
1341 CONNECTICUT AVENUE, N.W. WASHINGTON, D.C. 20036 TEL: (202) 331-7000 FAX: (202) 331-7010

ALTHOUGH ALL INFORMATION FURNISHED REGARDING ANY MATTER OR TRANSACTION IS FROM SOURCES DEEMED RELIABLE, SUCH INFORMATION HAS NOT BEEN VERIFIED, AND NO EXPRESS REPRESENTATION IS MADE NOR IS ... THE ACCURACY THEREOF, AND IT IS SUBMITTED SUBJECT TO ERRORS, OMISSIONS, CHANGE OF ANY TERMS OR OTHER CONDITIONS, PRIOR TRANSACTION OR WITHDRAWAL WITHOUT NOTICE.

# THE BANK COMPANIES
Commercial Real Estate Services

**Invoice**

Invoice Number: 5602
Invoice Date: 4/6/00
Page: 1

Bill To:
Dr. Peter Shin
Medlink Hospital & Nursing Cen
700 Constitution Avenue
Washington, DC  20002

CHC
Lyell
CK
ASAP

Customer ID 1265

| Reference | Payment Terms | Customer PO | Due Date |
|---|---|---|---|
| [Cap]itol Hill Hospita[l] | Immediately | | 3/31/00 |

| Description | Amount |
|---|---|
| [BRO]KERAGE SERVICES RENDERED: Consulting Services for Redevelopment of Capitol Hill Hospital Due: 7 hours @ $125 p/h | 875.00 |

8611/751

Check No:

| | |
|---|---|
| Subtotal | 875.00 |
| Sales Tax | |
| Total Invoice Amount | 875.00 |
| Payment Received | 0.00 |
| TOTAL | 875.00 |

EXHIBIT 2
ALL-STATE LEGAL SUPPLY CO.

[17]1 Connecticut Avenue, N.W.
Washington, D.C. 20036
202-331-7000
202-331-7010 Fax

# EXCLUSIVE ADVISOR AND BROKERAGE AGREEMENT

THIS AGREEMENT (the "**Agreement**") is made between Capitol Hill Group ("**Owner**") and Cassidy & Pinkard, Inc. ("**Advisor**") with respect to the property known as the Capitol Hill Hospital Site at 700 Constitution Avenue, NE, Washington, DC ("**Property**') this 14th day of January, 2003.

## BACKGROUND

Owner wishes to engage Advisor as the exclusive Advisor with the exclusive right to secure an investor(s) who will provide capital in the form of debt, equity or both in an amount sufficient to fulfill Owner's immediate needs to, among other things, satisfy certain indebtedness of Owner and extinguish certain liens encumbering the Property ("**Capital Event(s)**"). Capital Events may take the form (but shall not be limited to) a conventional first mortgage (permanent or construction), mezzanine financing junior to the first mortgage, equity financing, joint ventures, and sales to third party of all or part of the Property to a third party.

Owner also wishes to engage Advisor with the exclusive right to secure a developer who will provide development expertise for the potential redevelopment of all or a portion of the Property.

Owner recognizes that these assignments may involve multiple capital sources and multiple closings. Advisor shall provide Owner with analysis and advice on different capital structures and the relative merits and disadvantages of alternative financing and development alternatives.

Owner and Advisor acknowledge that (i) the Property is currently the subject of a sale agreement (which agreement Owner believes is expired) (the "**Holladay Agreement**"), with the Holladay Corporation ("**Holladay**"), (ii) Owner has had substantial negotiations with representatives of IBG Partners L.L.C. ("**IBG**") with respect to potential financing of the Property. Notwithstanding Owner's exclusive engagement of Advisor, Owner and Advisor agree that compensation of Advisor with respect to any transaction involving Holladay or IBG shall be governed solely by the Alternative Payment Structure set forth on Exhibit A.

## AGREEMENT

In consideration of the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Advisor hereby agree as follows:

1.0 BASIC TERMS:
The terms listed below shall have the meanings set forth after each term:

1.1 Owner:

Capitol Hill Group
ATTN: Dr. Peter C. Shin
700 Constitution Avenue, NE
Washington, DC 20002

1.2 Advisor:

Cassidy & Pinkard, Inc.
2001 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Attn:   Philip J. Mudd
        Christian T. Miles

1.3 Property: Land and improvements comprising Square 895, Lot 76, located at 700 Constitution Avenue, N.E., Washington, DC

1.4 Expiration Date: The earliest to occur of the following: (i) July 31, 2003, (ii) entry of a final order (which order would be entered over Owner's objection) requiring the sale of the Property to Holladay pursuant to the terms of the Holladay Agreement, and (iii) such other date as Owner and Advisor agree upon in a writing signed by Owner and Advisor.

1.5 Fees: See below and Exhibit "A"

2.0 ENGAGEMENT AND LIMITATIONS:

2.1 Appointment.

a. Owner hereby engages Advisor as Owner's exclusive Advisor with the exclusive right to find an investor, who will capitalize (in any of the ways, but not limited to those described in the section of this Agreement captioned "BACKGROUND") in whole or in part of the refinance and/or development of the Property on terms and conditions satisfactory to Owner.

-2-

b. Owner also engages Advisor as Owner's exclusive Advisor with the exclusive right to find a developer, who will assist Owner with the development of the Property on terms and conditions satisfactory to Owner.

c. Advisor agrees to perform the services required by this Agreement, as described in Section 4.0.

2.2 Bankruptcy Court Approval. This Agreement is subject to the approval the United States Bankruptcy Court for the District of Columbia, which court is presiding over the chapter 11 case captioned In re Capitol Hill Group, case number 02-0359. Owner will make reasonable efforts to promptly file appropriate pleadings seeking such Bankruptcy Court approval upon full execution of this Agreement. To the extent appropriate in order to be consistent with the terms of this Agreement, Owner agrees that any plan filed by Owner will incorporate (or otherwise appropriately accommodate) the terms of this Agreement.

2.3 Representatives. Initial representatives of Advisor shall be Philip J. Mudd and Christian T. Miles. If either is changed and the Owner does not, in its sole and absolute discretion approve the new representative, then the Owner has the option, without any charge, to terminate this Agreement.

2.4 Inquiries to Owner. Owners shall promptly refer all material inquiries with regard to the financing of the Property to Advisor.

3.0 TERM:

The term ("Term") of this Agreement shall commence on the date hereof and expire on the Expiration Date set forth in Section 1.4.

4.0 DUTIES AND SERVICES:

For the purposes of securing an investor(s) and/or a developer for the Property, Advisor's duties and services are described below:

4.0.a Inspection. Advisor shall conduct due diligence inspections of the Property.

4.0.b Review and Analysis. Advisor shall conduct an independent review of the Property's development potential, market area, and competition.

4.0.c  <u>Offering Memorandum</u>. Advisor shall assemble and produce offering memorandum(s) which is subject to the reasonable approval of Owner. Owner shall assist in promptly and fully providing the information necessary for Advisor to prepare an offering memorandum for the purpose of finding an Investor. Owner shall approve in writing the offering memorandum prior to distribution, in Owner's reasonable judgment, to be timely given. It is anticipated that this Offering Memorandum will be completed within 14 days from the date of this Agreement.

4.0.d  <u>Marketing.</u> After consultation with Owner, Advisor will: (i) review with Owner a list of potential investors and/or developers; (ii) recommend a strategy for offering the Property; (iii) prepare marketing materials (the "**Offering Memorandum**") for delivery to potential investors and developers; and (iv) upon receipt from Owner of its approval of the Offering Memorandum, diligently commence and pursue its efforts to find an investor and/or developer.

4.0.e  <u>Communications with Owner</u>. Advisor agrees to inform Owner of all offers with respect to the Property. Advisor shall deliver to Owner periodic progress reports setting forth the status of the marketing process. In addition, Advisor will attend meetings from time to time to update Owner as to the status of any prospective investor(s) and/or developer(s) and the marketing strategy of Advisor as requested by Owner.

4.0.f  <u>Negotiations.</u> Advisor shall screen and pre-qualify all prospective investors and developers and shall facilitate negotiations between such prospective parties and Owner.

4.0.g  <u>Closing.</u> Advisor shall participate, if deemed necessary and appropriate by Owner, in the preparation for closing so as to ensure a timely closing.

4.0.h  <u>Reservation.</u> Advisor shall within fifteen (15) days after the expiration or termination of this Agreement, submit a written list of prospective investors and/or developers with whom Advisor is then conducting active and substantial negotiations ("**Active Prospects**") which shall be subject to Owner's reasonable agreement. Should Owner conclude a definitive binding agreement (a "**Prospect Agreement**") with an Active Prospect on the above-mentioned list within ninety days after the date of expiration or termination of this Agreement (i.e., the Prospect Agreement is executed by such Active Prospect prior to the expiration of such ninety days and such Prospect Agreement is ultimately executed by Owner, irrespective of whether Owner's execution occurs by such date), Advisor shall be entitled to a fee paid in accordance with the applicable provisions of this Agreement as if such Prospect Agreement had been executed during the term of this Agreement.

5.0 FEES

    a. Advisor's compensation for its services hereunder (the "Fees") shall be set forth in Exhibit "A". Except as provided in subparagraph 4.0.h. above (in which case Advisor is entitled to a fee, if any, as described in subparagraph 4.0.h. above), Advisor shall only be paid the fee if an agreement (a "Definitive Agreement") is entered into with an investor(s) or developer during the Term

    b. The fees shall be due and payable only upon actual closing on the investment.

    c. No fee or other compensation shall be payable to Advisor in the event that, for any reason, closing of any capital event transactions contemplated herein is not consummated.

    d. Owner cannot be compelled to accept any offer.

5.1 Owner agrees to pay for all reasonable out-of-pocket marketing expenses of Advisor, not to exceed $5,000, which shall include, but not be limited to, photography, maps, plans and graphics. Such expenses shall be paid from time-to-time as incurred, but not more frequently than monthly upon submission of invoices and receipts by Advisor, and in no event later than thirty (30) days after the conclusion of the Term.

5.2 Owner and Advisor agree that compensation of Advisor with respect to any transaction involving Holladay or IBG, Advisor's fee shall be governed solely by the Alternative Payment Structure set forth on Exhibit A.

6.0 NOTICE:

Notice to either party shall be sufficient hereunder if given in writing and sent by either: (i) certified, mail, return receipt requested, or (ii) sent by a nationally recognized courier service (e.g. Federal Express) for next day delivery, to be confirmed by said courier in writing, addressed to Owner as follows:

    Capitol Hill Group
    Attn: Peter C. Shin
    700 Constitution Avenue, N.E.
    Washington, DC 20002

    with copy to:

    Patrick Potter, Esq.
    Shaw Pittman Potts & Trowbridge
    2300 N Street, NW
    Washington, DC 20037-1128

        and addressed to Advisor at:

        Cassidy & Pinkard, Inc.
        2001 Pennsylvania Avenue, NW, Suite 800
        Washington, D.C. 20006
        Attn:   Philip J. Mudd
                 Managing Director

Any such notice shall be deemed to have been given (i) when first refused, (ii) if sent by certified mail, on the date of receipt indicated by the return receipt or if by courier, on the day of receipt confirmed by the courier, whichever is earlier as between the events described in clauses (i) or (ii), or (iii) the day after sending.

7.0   MISCELLANEOUS

    7.1   <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between Owner and Advisor with respect to the Property. There are no prior or additional agreements, conditions, or understandings except for those set forth in this Agreement.

    7.2   <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia.

    7.3   <u>Successors and Assigns</u>. This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns (other than, with respect to Owner, a trustee or the holder's of liens encumbering the Property); provided, however, that Advisor may not assign its rights or obligations hereunder without the prior written consent of the Owner, and any attempted assignment without Owner's written consent shall be void and shall constitute a default under this Agreement.

    7.4   <u>Authority</u>. The individual signing this Agreement on behalf of each party represents to the other party that he has the authority to execute this Agreement (subject to Bankruptcy Court approval).

    7.5   <u>Approvals</u>. In each case in which a party has a right of consent or approval under this Agreement, such consent or approval may be exercised in the party's sole discretion unless expressly provided to the contrary herein.

7.6 **Authority of Advisor.** Advisor is not an agent of Owner and has no authority to make any representation on behalf of Owner or to incur any obligation on behalf of Owner.

IN WITNESS WHEREOF, the parties have caused this Agreement as of the date set forth above.

OWNER: _Rxlslem Fox_

By: _Capital Hill Group_

Name: _Peter Eshu Om_

Title: _Rent_

ADVISOR: CASSIDY & PINKARD, INC.

By: _[signature]_

Name: _Christain T. Miles_

Title: _Senior Vice President_

# EXHIBIT A

## "Regular Fee Rate Schedule"

1. Advisor's fee for arranging conventional first mortgage financing shall be one percent (1%) of the total amount committed, payable at the time of the initial disbursement by the investor at said Capital Event.

2. Advisor's fee for arranging equity and/or mezzanine debt shall be three percent (3%) of the gross amount committed by the investor. Said fee shall be due and payable at the time of the initial disbursement of said Capital Event.

3. The parties agree that in many cases, it may be difficult to distinguish between what is and is not conventional first mortgage financing. Therefore, Advisor agrees that in no Capital Event will its fee from paragraphs (1) and (2) above be greater than one and one-half percent (1.5%) of the total capitalization. For example, the fee for a Capital Event related to an equity investment which reasonably coincides with the closing of a construction loan would be limited to 1.5% of the combined amounts committed by the respective investors.

4. In the event Owner sells all or a portion of the Property to a third-party, Advisor's fee shall be equal to three percent (3%) of the gross sales price.

## "Alternative Payment Structure"

1. In the event the Owner enters into a transaction for the Property with IBG, then Advisor's fee shall be 60% of the fee due under the Regular Fee Rate Schedule.

2. In the event of a transaction for the Property with Holladay, Advisor's fee shall be as follows:

   a. Advisor shall not be entitled to any fee with respect to a sale of the Property (or any portion thereof) by Owner to Holladay in accordance with the terms of the Holladay Agreement.

   b. In the event Owner and Holladay enter into a new transaction (i.e., on terms other than the Holladay Agreement), then Advisor's fees shall be 60% of the fee due under the Regular Fee Rate Schedule.