**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|   |   |   |
|---|---|---|
| IN RE: CAPITOL HILL GROUP, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | Civil Action No. 05-1547 (EGS) |
| | ) | |
| | ) | |

**<u>MEMORANDUM OPINION</u>**

This case comes on appeal from the United States Bankruptcy
Court for the District of Columbia.  Appellant is Newmark of
Washington D.C., LLC, d/b/a/ Newmark & Bank Company (Newmark).[1]
Appellee is Capitol Hill Group ("CHG"), a non-profit mutual
benefit corporation that owned two parcels of real property when
the events in question took place.  This appeal challenges the
bankruptcy court's decision that Newmark's claim to a commission
from the appellee is barred by D.C. Code § 42-1705.  That statute
precludes real estate agents from collecting brokerage
commissions in the absence of a written listing agreement.  For
the reasons discussed below, the Court affirms the decision of
the bankruptcy court.

**I.    BACKGROUND**

In January of 2000, the Holladay Corporation ("Holladay")
made an offer to CHG to purchase two properties in Washington
D.C., one located at 7th Street N.E. ("7th Street property") and

_____

[1]The Court will refer to Newmark's predecessor-in-interest
and Newmark collectively as "Newmark" throughout this opinion.

one at 700 Constitution Avenue, N.E. ("Constitution Avenue

property").   Dr. Shin, CHG's principal, employed Newmark to

provide valuation services and assist CHG in maximizing its

economic return of the properties.   Newmark subsequently "helped

research, review, and negotiate a contract dated March 24, 2000,

in which Holladay agreed to purchase part of the Property."   Bank

Decl. at ¶ 7.

In a letter dated March 27, 2000 ("March 27 letter"),

Newmark provided CHG with an overview of the agreement allegedly

governing the relationship between the two companies.   The letter

sets forth terms and conditions under which it would "perform

real estate brokerage and sales services" in connection with the

sale of the Constitution Avenue property.   The terms of the

letter required CHG to pay an advance retainer of $1,500, and CHG

would pay Newmark representatives their "current hourly rates" as

specified.   Fees would "generally be based upon the amount of

time spent by [Newmark's] real estate professionals and support

staff . . . and certain expenses incurred by [Newmark] that are

allocable to that representation."   In addition to the hourly

fee, the letter stated that Newmark is entitled to a commission

of 1% of the purchase price in the event the land was sold during

the term of the agreement or to any purchaser who is identified

within two years after the agreement's termination.   The letter

does not have a termination date, and it does not distinguish

between services performed for the hourly rate and services performed for commission.

Finally, the letter specifies the manner in which CHG should consent to the agreement.  "If the arrangements set forth are agreeable, please acknowledge your understanding thereof and agreement thereto by having the enclosed two (2) copies of this letter dated and executed in the space provided below and returning one executed copy thereof to us." Although CHG admits receiving the letter, CHG never signed or returned an executed copy to Newmark and no retainer was paid. Newmark claims, and CHG denies, that the March 27 letter memorialized a pre-existing oral agreement. CHG does admit an oral agreement to pay an hourly fee.

A second letter, dated September 29, 2000 ("September 29 letter"), purports to amend "the earlier consulting and commission agreement dated March 27, 2000, regarding the sale and development" of the property.  This letter indicates that Newmark would be "advising [CHG] on the disposition of this property and will to [*sic*] provide unbiased, strategic advice as you continue to analyze your various options."  According to Newmark, this letter memorializes an oral agreement that representatives of the parties reached during a round of golf.  CHG denies the existence of that oral agreement, but it admits receiving the letter.

The September 29 letter provides that Newmark is to receive 1% commission on the 7th Street property and a 3% commission on

the Constitution Avenue property, and it terminates the hourly free structure described in the March 27 letter.  The September 29 letter contains instructions for executing the agreement identical to the March 27 letter.  As in the case of the March 27 letter, CHG did not execute and return a copy of the letter as requested.

Between the letters, Newmark provided CHG with one invoice, dated April 6, 2000, for seven hours of service at a rate of $125 per hour.  That invoice was paid on April 26, 2000.  There were no further invoices sent and no further payments were made.

On December 8, 2000, Holladay and CHG entered into a purchase and sale agreement for both properties ("sales agreement").  The purchase and sale agreement contained a provision stating: "Seller [CHG] has used the services of the Bank Companies [Newmark's predecessor-in-interest] and Seller shall be solely responsible for paying the fees and commissions owed to the Bank Companies, pursuant to a separate written agreement."  Newmark was not a party to those agreements.

The 7th Street property was sold pursuant to that agreement. The Constitution Avenue property was never sold, and Holladay and CHG do not intend to proceed with that sale.  Newmark asserts a claim for commission on both properties.

## II.   STANDARD OF REVIEW

Newmark appeals the bankruptcy court's resolution of cross-motions for summary judgment.  Because the bankruptcy court did not make findings resolving disputed facts, but instead ruled based on what it perceived to be undisputed material facts, the standard of appellate review is *de novo*.  *United States v. Spicer*, 57 F.3d 1152, 1160 (D.C. Cir. 1995).

## III. DISCUSSION

Chapter 17 of the D.C. Code sets forth the duties of real estate brokers in DC.  "The purposes of this subchapter are to protect the public against incompetence, fraud and deception in real estate transactions."  Section 45-1945 of the D.C. Code was enacted in 1981 and provided that, "A written listing contract is required in the District for the sale of all real property."  The statute was amended in 1997 and now states, "A written listing contract is required in the District for the sale of all real property.  A licensee shall not receive payment of a commission in the absence of a written listing contract."  A written listing contract is defined as "a contract between a broker and an owner in which the owner grants to the broker the right to find a purchaser for a designated property at the price and terms the owner agrees to accept, and the broker, for a fee, commission, or other valuable consideration, promises to make a reasonable

effort to obtain a purchaser for the term of the contract." D.C.

Code § 42-1702(14). This Court concludes, as did the bankruptcy

court, that the statute's clear prohibition bars Newmark's claim

for commission.

Newmark maintains that this statute is inapplicable to the

services it rendered to CHG and, even if the provision were

applicable, there are sufficient documents to satisfy the written

requirement.[2] For the reasons substantially set forth by the

bankruptcy court, this Court disagrees with Newmark.

### A. Section 42-1705 of the D.C. Code is applicable to Newmark's services

Newmark claims that it did not function as a broker whose

responsibility was "to find a purchaser for a designated

property" as defined by D.C. Code § 42-1702(14). Rather, Newmark

contends that it merely provided consulting services.

Newmark's interpretation is unpersuasive in view of the

---

[2]Newmark also half-heartedly re-argues before this Court
that the doctrines of estoppel and prevention entitle it to
summary judgment. The Court is no more persuaded by these
arguments than the bankruptcy court. As to the estoppel
argument, the Court agrees that Newmark is a sophisticated party
aware of the risk it assumed by conducting business pursuant to
an "agreement" not memorialized by a signed contract. In
addition, the bankruptcy court held that the prevention doctrine
argument presumes an underlying right to a commission. Because
Newmark has failed to establish that right, the Court agrees with
the bankruptcy court that the prevention doctrine is
inapplicable.

clear language of the statute: "a licensee *shall not* receive

payment of a commission in the absence of a written listing

agreement."  D.C. Code § 42-1705 (emphasis added).  The language

of the statute is both broad and mandatory.  It is not limited to

those licensees who agree to procure a buyer, and it does not

create an exception for licensees whose predominant role with

respect to the sale of property is consultation and contract

negotiation rather than actual procurement of a buyer.

The record reflects that Newmark provided at least some

brokerage services.  The March 27 letter characterizes the

services as "real estate brokerage and sales services."  Newmark

argues that the September 29 letter characterizes the agreement

as one for "consulting and commission."  As the bankruptcy court

noted, however, the September 29 letter does not negate or

retract its earlier representation that it intended to perform

real estate and sales services.

Newmark relies upon the statement of Dr. Shin, who said, "I

didn't consider [Laurence Bank of Newmark] to be a real estate

broker.  He was a real estate adviser."  Shin Depo. at 93.

Regardless of how Dr. Shin perceived Newmark, however, the record

reflects that Newmark did solicit at least one buyer and pursued

other purchases for the debtor's property.  *See* February 20, 2001

letter from Banks to Shin ("We solicited competitive bids for the

North Tower [the Constitution Ave. Property]."); September 13,

2000 letter from Andrew Montelli, Fairfield Residential Companies

to Dr. Shin ("Ms. Lisa Benjamin of Newmark and Bank has informed

us there is a possibility of your Capitol Hill Hospital site [the

Properties] may become available.  Should this happen, Fairfield

Residential would be interested in pursuing this property at

market price.").

Neither the language of the statute nor the March 27 and

September 29 letters provide a basis to selectively apply the

written listing requirement to only the brokerage services

covered by the "agreement."  Rather, D.C. Code § 42-1705 is

applicable to the entire "agreement" between Newmark and CHG.

Newmark maintains that the letters did confirm that compensation

was not contingent on Newmark finding a buyer.  Therefore,

according to Newmark, no written listing agreement was necessary,

regardless of whether some of Newmark's activities were

"traditional brokerage services."  The Court agrees with the

bankruptcy court, however, this is a matter of semantics.

Although Newmark may not have explicitly agreed to procure a

buyer in exchange for commission, the letter "agreements" did

seek to limit CHG's right to hire another broker to perform such

services, unless CHG was willing to pay two brokerage

commissions.

In sum, the Court affirms the holding of the bankruptcy

court that D.C. Code § 42-1705 applies to Newmark's services and,

therefore, that a written listing agreement is required in order
for Newmark to collect a commission.

### B.    The writings are insufficient to satisfy D.C. Code §
42-1705

Newmark argues that even if D.C. Code § 42-1705 does apply,
the written listing requirement is satisfied by the sales
agreement between CHG and Holladay, either standing alone or when
read together with the March 27 and September 29 letters.  The
bankruptcy court disagreed, and this Court affirms that holding.
The only written documents between CHG and Newmark that purport
to govern the parties' relationship are the March 27 and
September 29 letters.  CHG never signed or returned the letters,
despite specific instruction that CHG do so in order to
"acknowledge [its] understanding thereof and agreement thereto."
*See* March 27 letter and September 29 letter.  Given this express
language of the letters, it would be unreasonable to conclude
that CHG accepted the agreement by silence.

Even if the two letters are read collectively with the sales
agreement between CHG and Holladay, the written listing
requirement is not satisfied.  Newmark urges the court to
analogize this case to the statute of fraud context, in which
reference to several documents could be pieced together to
satisfy the written requirement.  Specifically, Newmark argues
that the two letters constitute writings documenting the contract

between the parties and the sales contracts provide signed

writing to CHG confirming the contract.  The Court sees no reason

to resort to the statute of frauds analogy, however, when the

language of D.C. Code § 42-1705 is clear and applicable.  Indeed,

the very fact that D.C. Code § 42-1705 exists suggests that the

D.C. Council recognized a need for a writing requirement for

brokerage agreements separate and distinct from the statute of

frauds.

The Court agrees with the bankruptcy court that the purchase

agreements, viewed independently or together with the letters,

do not satisfy the writing requirement.  Purchase agreements, to

which Newmark is not a party, do not satisfy the written

agreement requirement.  *See Hursey v. Porter & Associates v.*

*Bounds*, 1994 WL 762670, * 10 (Del. Super. Dec. 2, 1994)

(unpublished decision)(reference in sales contract to sellers

obligation to pay third-party brokerage fee does not constitute a

listing agreement); *Bensen v. Gall*, 605 A.2d 841 (Vt. 1992)(sales

agreement containing essential terms of the commission contract

did not cure absence of a written listing agreement.).  Newmark

argues that these cases are not persuasive because those sales

contracts did not incorporate other, unsigned written agreements

between the broker and seller, as this case does.  The letters of

March 27 and September 29, however, are immaterial.  They have

not been executed, and the statute of frauds analogy is not

appropriate in view of the clear language to D.C. Code § 42-1705 requiring a written listing agreement.  Because Newmark cannot point to any written listing agreement with CHG, D.C. Code § 42-1705 bars Newmark from collecting a commission on the properties.

Even if the statute could be satisfied by piecing together multiple documents, as in the statute of frauds context, the documents in this case are not sufficient.  The Court agrees with the bankruptcy court's conclusion that Newmark was not a party to the sales agreements and the circumstances strongly suggested that the language was included in the sales agreements to allocate burdens between buyer and seller, not to create rights in Newmark.  Moreover, a reference in the purchase agreements to a separate written agreement between Newmark and CHG does not obviate the need for Newmark to demonstrate that a separate written agreement actually exists before it take on the heightened significance within the context of the sales agreements.

Finally, Newmark argues that the sales agreement alone is sufficient because it was a third party beneficiary of the sales agreements.  Newmark cites to *A.S. Johnson, Co. v. Atlantic Masonry Co.*, 693 A.2d 1117, 1123 (D.C. 1997) (*citing Moran v. Audette*, 217 A.2d 653, 654 (D.C. 1966)("A broker [is] a third-party beneficiary of a contract between a landlord and a tenant that required the tenant to 'pay all real estate commissions

11

arising out of the negotiations and executions of the leases,'
even though the broker was not expressly named in the
agreement.").

The bankruptcy court correctly held, however, that Newmark
cannot assert rights as a third-party beneficiary if it cannot
also demonstrate an independent right to a commission triggered
by the sales agreement.  Evidence from both Holladay and CHG
demonstrates that Newmark was not an intended beneficiary of the
sales agreement.  *See* Affidavit of Rita Bamberger at ¶¶ 13, 14,
Affidavit of Dr. Peter Shin at ¶¶ 15, 16.  As CHG points out,
Newmark is, at best, an unintended beneficiary, and Newmark has
not provided the Court with any authority that an unintended
third-party beneficiary can rely upon a tertiary document to
satisfy a broker's statutory requirement for a writing or any
other statute of frauds.

### V.    CONCLUSION

For the foregoing reasons, the Court finds that D.C. Code §
42-1705 applies to this case and that there are insufficient
writings to satisfy the statute's requirement for a written
listing contract.  Therefore, the decision issued by the
bankruptcy court is **AFFIRMED**.  An appropriate Order accompanies
this Memorandum Opinion.

**Signed:    Emmet G. Sullivan**

United States District Judge
June 20, 2006